# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WIRTGEN AMERICA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00308** |
| | ) | **Judge Aleta A. Trauger** |
| **HAYDEN-MURPHY EQUIPMENT** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Hayden-Murphy Equipment Company ("Hayden-Murphy") has filed a Motion to Dismiss (Doc. No. 24), to which Wirtgen America, Inc. ("Wirtgen") has filed a Response (Doc. No. 25), and Hayden-Murphy has filed a Reply (Doc. No. 27). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND[1]

### A. The Parties' Relationship and Wirtgen's Desire to End It

Wirtgen is a Tennessee-based supplier of road construction and surface mining equipment. The end users of Wirtgen's goods are typically contractors or governments, who buy or rent the equipment they need through Wirtgen's network of independent dealers. (Doc. No. 18 ¶¶ 12–14.) Hayden-Murphy is one such dealer. On January 1, 2010, Wirtgen and Hayden-Murphy entered into a Distributor Sales and Service Agreement, whereby Hayden-Murphy agreed to be a

---

[1] Unless otherwise indicated, these facts come from Wirtgen's Amended Complaint for Declaratory Judgment (Doc. No. 1) and are taken as true for the purposes of the pending motion.

nonexclusive dealer of various lines of Wirtgen products in Minnesota. (*Id.* ¶¶ 15–16; Doc. No. 18-2.)

In 2017, Wirtgen's parent company was acquired by John Deere & Co. ("Deere"). (Doc. No. 18 ¶ 18.) According to Wirtgen, its "dealer network is not fully aligned with Deere's dealer network," and, "[b]ecause of that misalignment, there are many regions of North America where there is one dealer which sells and services Wirtgen's products and a separate dealer which sells and services Deere's products." (*Id.* ¶ 19.) Faced with that reality, Wirtgen decided to begin taking steps to "align" its dealer network with the Deere network. (*Id.* § 20.) Wirtgen did not, however, immediately seek to end its relationship with Hayden-Murphy.

On August 13, 2018, Hayden-Murphy's then-CEO, Len Kirk, sent Wirtgen a letter, informing Wirtgen that Hayden-Murphy was in the process of what Wirtgen describes as a "substantial change in the control of Hayden-Murphy and the loss of managers, officers, and key employees within Hayden-Murphy, including, but not limited to, [Kirk] himself, who was stepping down as CEO after 30 years of service." (*Id.* ¶ 26.) On September 6, 2018, Kirk met with Wirtgen President James P. McEvoy and Vice President of Dealer Development Brodie Hutchins to discuss matters including the turnover in Hayden-Murphy's leadership. McEvoy and Hutchins expressed their dismay at the changes and, in particular, at the fact that Wirtgen had not received more advance notice of the transition. (*Id.* ¶ 27.) McEvoy and Hutchins informed Kirk that Wirtgen "did not approve or consent to the changes that were being made." (*Id.* ¶ 28.)

In many areas of business, that type of language—involving one company's refusal to "consent" to a leadership change at another, wholly independent company—might seem unusual. Such issues of inter-company consent and agreement, however, have special significance in the law of distributorships and franchises. Many states have enacted statutory protections designed to

prevent manufacturers and suppliers[2] from unilaterally imperiling the financial health of the companies and individuals who sell their products without good cause. In so doing, those statutes, by necessity, restrict the parties' ordinary freedom of contract. For example, Tenn. Code Ann. § 47-25-1302 requires that "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause," even if the parties' contract says otherwise. Tenn. Code Ann. §§ 47-25-1302(a), -1312. The statute defines "good cause" to refer, first, to any "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." *Id.* The statute then lists a series of additional events that qualify as "good cause" as a matter of law, including the loss or retirement of "a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder." Tenn. Code Ann. § 47-25-1302(a)(6). Good cause, however, "does not exist if the supplier consents to" the qualifying change in leadership. *Id.* The issue of Wirtgen's consent was therefore potentially relevant to whether Kirk's departure gave rise to "good cause" to terminate the parties' agreement.

After the meeting on September 6, 2018, Hutchins confirmed Wirtgen's position in a letter to Kirk dated September 20, 2018. Hutchins wrote:

> We have taken some time since our meeting to consider what you said. Even though you will still be part of the customer relationships during the transition, we nevertheless have concerns regarding the succession. We are . . . unaware of any meaningful relationships between [incoming Hayden-Murphy President Don Knackstedt] and our customer base.
>
> Because of these concerns, we are not presently able to consent to this substantial change in management and control. We will continue to monitor the situation between now and your actual retirement. We hope you understand.

---

[2] "Supplier," in this context, refers to a company that sells goods to distributors, much as a manufacturer would, but which is not necessarily the entity that actually manufactured those goods. For present purposes, the distinction between manufacturer and non-manufacturer supplier is of no importance.

3

(Doc. No. 18-3 at 2.)

Despite the concerns that Wirtgen raised in 2018, the parties' relationship remained formally intact for the ensuing few years. However, on April 8, 2022, McEvoy sent Knackstedt a letter informing him that "Wirtgen strongly believe[d] that the time has come to allow each of [the two] companies to pursue its business objectives separately." (Doc. No. 18-4 at 4.) McEvoy explained:

> [W]e think we have the right to terminate the Agreement as a result of the recent personnel changes Hayden-Murphy has undergone, but we believe there is another provision of the Agreement that is also applicable to the present situation.
>
> Section 5.01 of the Agreement says that it became effective on January 1, 2010 and will automatically expire at the end of each calendar year unless both Hayden-Murphy and Wirtgen consent to renew it. After the Agreement went into effect, it remained in Wirtgen's interest to consent to the renewal of the Agreement. With John Deere & Co.'s acquisition of Wirtgen, however, that is no longer the case. . . . We're not saying that Hayden-Murphy was in any way responsible for the misalignment that now exists in Wirtgen's and Deere's dealer networks, nor are we encouraging Hayden-Murphy to become a Deere dealer. We are saying that the Agreement, with its automatic, annual expiration provision absent mutual consent, is designed to accommodate situations like this where it is no longer in one party's business interest to remain in business together. And[] we intend to exercise our right to allow the Agreement to expire at the end of the year, depending upon your response to this letter.

(*Id.* at 2.)

Knackstedt sent a letter in response, which Wirtgen received around April 27, 2022. (Doc. No. 18 ¶ 32; Doc. No. 18-5.) Knackstedt explained that he was "writing to respond to the specifics of [McEvoy's] letter and also in hopes that both sides can see that working together . . . makes a lot more business sense than engaging in a protracted legal battle." (Doc. No. 18-5 at 2.) Knackstedt stated that, in Hayden-Murphy's view, "Wirtgen cannot simply non-renew the Agreement, and[,] instead, there must be 'good cause' to terminate . . . ." (*Id.* at 2.) Knackstedt then provided a lengthy argument that Kirk's departure did not provide Wirtgen with grounds for

terminating the contract and that, in the alternative, if that departure did originally amount to good cause, then it could no longer do so in light of Wirtgen's supposed acquiescence to the change. (*Id.* at 2–5.) The letter includes references to an unidentified state statute that, according to the letter, forbids actions such as Wirtgen's attempt to end the agreement. (*Id.* at 2, 5.)

**B. Relevant Contractual Provisions**

The parties' Distributor Sales and Service Agreement states that it is "renewable annually upon the consent of both parties." (Doc. No. 18-2 at 16.) If the parties mutually agree to terminate the contract, they may do so at any time. (*Id.*) Otherwise, a decision by one party to terminate the contract must comply with certain procedures. Under the terms of the contract as written, either Wirtgen or Hayden-Murphy "may terminate this Agreement at any time, with or without cause, upon sixty (60) days written notice to the other party." (*Id.*) However, the Agreement grants Wirtgen accelerated termination rights in certain situations. Specifically, there is a list of nine occurrences that, if they come to pass, grant Wirtgen a right to immediately terminate the agreement upon written notice, and there is a second list of ten other occurrences that would grant Wirtgen the "right to terminate this Agreement upon thirty (30) days written notice and opportunity to cure." (*Id.* at 17–18.) Among the events giving rise to a 30-day-notice termination right are the following:

> c. Any dispute, disagreement or controversy between or among the principles, parties, managers, officers or stockholders of [Hayden-Murphy] or any loss of managers, officers or key employees through termination of employment or otherwise, which in the commercially reasonable judgment of [Wirtgen] may adversely affect the business of [Hayden-Murphy] or [Wirtgen]; . . .

> j. A substantial change in the ownership or control of [Hayden-Murphy] without prior written consent of Wirtgen.

(*Id.* at 18.)

5

The contract includes a provision forbidding Hayden-Murphy from selling, assigning, delegating, or otherwise transferring any of its "rights or obligations" under the agreement. (*Id.* at 25–26.) Although this case does not involve assignment of Hayden-Murphy's rights in the ordinary sense, the language of the provision implicates issues surrounding Kirk's departure that did arise between the parties:

> [Wirtgen] has entered into this Agreement in reliance upon the representations and personal abilities of the current owners and managers of [Hayden-Murphy]. The parties agree that the rights conferred on [Hayden-Murphy] by this Agreement are contingent upon the continuation of the present owners and managers of [Hayden-Murphy]. Any merger, consolidation, transfers of assets, event or transaction which results (whether by operation or law or otherwise) in a change of ownership or control of [Hayden-Murphy] or [Hayden-Murphy's] business shall be deemed an assignment by [Hayden-Murphy] for purposes of this Agreement. This Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of the parties.

(*Id.* at 26.)

Finally, the contract includes the following choice-of-law provision, which also addresses the issue of how the contract should be construed if any of its provisions are unlawful:

> This Agreement shall be construed, interpreted and enforced in accordance with the laws of the state of Tennessee. Any action between [Wirtgen] and [Hayden-Murphy] shall be filed either in the United States District Court for the Middle District of Tennessee or in the Chancery Court for Davidson County, Tennessee, and the parties hereby consent to the jurisdiction and venue of the foregoing courts. If the performance of any obligation or the exercise of any right pursuant to this Agreement would be unlawful, such performance or exercise shall be modified to the minimum extent necessary to comply with such law, without invalidating the remainder of this Agreement.

(Doc. No. 18-2 at 25.)

## C. This Case

On April 28, 2022, Wirtgen filed a Complaint for Declaratory Judgment against Hayden-Murphy in this court. (Doc. No. 1.) That Complaint was superseded by an Amended Complaint on July 15, 2022. (Doc. No. 18.) Wirtgen asks the court to declare that:

6

(a) Wirtgen has the right to allow the Agreement to expire at the end of this calendar year by not consenting to its renewal and (b) Wirtgen has the right to terminate the Agreement as of the end of this calendar year as a result of (i) a substantial change in the control of Hayden-Murphy without Wirtgen's consent, (ii) a change in the managers of Hayden-Murphy without Wirtgen's advance approval, and/or (iii) a loss of managers, officers, or key employees which, in Wirtgen's commercially reasonable judgment, may adversely affect the business of Hayden-Murphy or Wirtgen.

(Doc. No. 18 ¶ 37.)

On July 29, 2022, Hayden-Murphy filed a Motion to Dismiss. (Doc. No. 24.) Hayden-Murphy argues that the court should dismiss Wirtgen's claim because, even if the facts are all as Wirtgen has alleged, Wirtgen does not have a right to terminate or decline to renew the parties' contract.

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal

7

conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III. ANALYSIS

### A. Choice of Law

This case is in federal court due to the diversity of citizenship between the parties, but the law at issue is state law. The parties disagree, however, regarding which state's laws apply—Tennessee's (as the parties' Agreement directs) or Minnesota's (as Hayden-Murphy argues that the law requires). Typically, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). This court therefore must apply Tennessee's rule that a contract is typically "presumed to be governed by the law of the jurisdiction in which it was executed" but that the parties can overcome that presumption by manifesting "a contrary intent." *Vantage Tech v. Cross*, 17 S.W. 3d 637, 650 (Tenn. Ct. App. 1999) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). The clearest and simplest way to manifest that contrary intent is by including an express choice-of-law provision, *id.*, as Wirtgen and Hayden-Murphy did.

Under Tennessee choice-of-law principles, when parties manifest an intent to apply the laws of another jurisdiction by adopting a choice-of-law provision, then that intent will be honored—if certain requirements are met. *Id.* Specifically, "[t]he choice of law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction,

8

the basis for the jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Sw. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 n.8 (6th Cir. 2006). There is no plausible argument that the Tennessee choice-of-law provision would fail any of the first three of those requirements. There is no basis for concluding that the provision was adopted in bad faith, and Tennessee clearly has at least some material, rational, and non-sham connection to the agreement, given that Wirtgen is a Tennessee company. That leaves the questions of (1) whether applying Tennessee law would be contrary to a "fundamental" public policy of Minnesota, (2) whether Minnesota law would "otherwise govern" the contract, and, (3) if so, whether Minnesota has a greater interest in the parties' relationship than Tennessee. The first item on that list overlaps, to some degree, with the first step of performing a choice-of-law analysis as a more general matter: ascertaining whether there is a material difference between the laws of the relevant states. *See Lemons v. Cloer*, 206 S.W.3d 60, 64–65 (Tenn. Ct. App. 2006) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992)). The difference, if any, between the state laws under consideration sets the stage for determining whether any such difference is fundamental.

As the court has discussed, Tennessee law would examine the termination of the parties' relationship pursuant to the terms of its equipment retail distributorship termination statute, Tenn. Code Ann. § 47-25-1302, which provides, in relevant part:

> (a) No supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause. "Good cause" means failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state. In addition, good cause exists whenever: . . .

9

(6) The retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership. However, good cause does not exist if the supplier consents to an action described in this subsection (a).

(b) Except as otherwise provided herein, a supplier shall provide a retailer with at least ninety (90) days' written notice of termination, cancellation or nonrenewal of the retail agreement and a sixty-day right to cure the deficiency. If the deficiency is cured within the allotted time, the notice is void. . . . The notice shall state all reasons constituting good cause for action. The notice is not required if the reason for termination, cancellation or nonrenewal is a violation under subsection (a).

Tenn. Code Ann. § 47-25-1302. Minnesota, however, has its own, quite similar but not identical,

statute governing the same subject matter for heavy equipment dealers:

**Subdivision 1**. **Good cause required.** No equipment manufacturer, directly or through an officer, agent, or employee may terminate, cancel, fail to renew, or substantially change the competitive circumstances of a dealership agreement without good cause. "Good cause" means failure by an equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated dealers by their terms. In addition, good cause exists whenever:

(a) Without the consent of the equipment manufacturer who shall not withhold consent unreasonably, (1) the equipment dealer has transferred an interest in the equipment dealership, (2) there has been a withdrawal from the dealership of an individual proprietor, partner, major shareholder, or the manager of the dealership, or (3) there has been a substantial reduction in interest of a partner or major stockholder. . . .

**Subd. 2. Notice.** Except as otherwise provided in this subdivision, an equipment manufacturer shall provide an equipment dealer at least 90 days' prior written notice of termination, cancellation, or nonrenewal of the dealership agreement. The notice must state all reasons constituting good cause for the action and must provide that the dealer has until expiration of the notice period in which to cure a claimed deficiency. If the deficiency is rectified within the notice period, the notice is void. The notice and right to cure provisions under this section do not apply if the reason for termination, cancellation, or nonrenewal is for any reason set forth in subdivision 1, clauses (a) to (g).

10

Minn. Stat. Ann. § 325E.0681. Minnesota's statutes governing the manufacture and sale of heavy equipment—which, together, make up that state's Heavy and Utility Equipment Manufacturers and Dealers Act, or "HUEMDA"—include a provision forbidding certain contractual terms, including choice-of-law provisions, that would waive rights under those statutes:

> A term of a dealership agreement either expressed or implied, including a choice of law provision, that is inconsistent with the terms of sections 325E.068 to 325E.0684 or that purports to waive an equipment manufacturer's compliance with sections 325E.068 to 325E.0684 is void and unenforceable and does not waive any rights that are provided to a person by sections 325E.068 to 325E.0684.

Minn. Stat. Ann. § 325E.0683.

The relevant substantive differences between the Tennessee and Minnesota statutes are few. Each statute applies to a decision to "terminate, cancel, fail to renew or substantially change" the parties' contractual relationship. Each statute requires good cause, which includes failure to comply with an ordinary condition of the parties' contract. Each statute recognizes categorical good cause based on the departure of an "individual proprietor, partner or major shareholder" of the distributor without the supplier's consent. The statute's respective approaches to the departure of non-owner managers differ somewhat, although it is not clear, from the statutes' respective faces, whether that difference is substantive or cosmetic. The Minnesota statute includes, in the aforementioned list of individuals whose departure may give rise to good cause, "the manager of the dealership," and the Tennessee statute does not, at least not so clearly. The relevant Tennessee provision does, however, include any "person with a substantial interest in the ownership *or* control of the dealership," Tenn. Code Ann. § 47-25-1302(a)(6) (emphasis added), which, though confusing, seems to contemplate the inclusion of individuals with substantial control over the business but no equity therein—that is, potentially, high-ranking managers. In any event, the materials filed with the Amended Complaint confirm that Kirk was both a manager and part owner

11

of Hayden-Murphy and that his retirement did, in fact, entail the reversion of his 10% ownership stake in the company to its principal owner, Barbara Lupient. (*See* Doc. No. 18-5 at 4.)

There is at least one other significant facial difference between the statutes that is potentially relevant to this particular case. The Minnesota statute expressly states that, in the face of a proposed change in ownership or control, the "equipment manufacturer . . . shall not withhold consent unreasonably." Minn. Stat. Ann. § 325E.0681(1). Tennessee's statute contains no such express reasonableness requirement applicable to consent in connection with a change in ownership or control.[3] *See* Tenn. Code Ann. § 47-25-1302(a)(6). The significance of that difference to this case, however, is far from established. The issues raised here may be *capable* of being considered through the lens of reasonableness—because reasonableness is, after all, a broad concept—but the ultimate questions at issue fit far more cleanly into more specific concepts like waiver and implied consent. There is no reason, moreover, to think that Tennessee's statute ignores those narrower, more pertinent doctrines; to the contrary, Hayden-Murphy itself asserts repeatedly that its arguments regarding Wirtgen's failure to exercise a timely termination right would prevail under either statute, without any need to rely on an express statutory reference to reasonableness.

Most decisions to terminate distributorships, moreover, presumably reflect exercises in business judgment—an inherently uncertain task in which reasonableness restrictions, even where they apply, are relatively modest and permit a "range" of actions. *In re Khan*, No. 19-04258, 2021 WL 2563017, at *2 (Bankr. W.D. Mich. June 21, 2021); *see also In re TIC Memphis* RI 13, LLC, 498 B.R. 831, 837 (Bankr. W.D. Tenn. 2013) ("Reasonableness is not judged in hindsight, but rather at the time the business judgment is exercised."). The hypothetical set of cases in which the

---

[3] Tennessee's statute does have an express reasonableness requirement applicable to the withholding of approval of a new business location. *See* Tenn. Code Ann. § 47-25-1302(a)(2).

difference between the two statutes would actually be expected to make a difference is, therefore, likely small and does not fit this case.

Indeed, Hayden-Murphy refuses to commit itself to acknowledging *any* particular difference between Tenn. Code Ann. § 47-25-1302 and Minn. Stat. Ann. § 325E.0681. (*See* Doc. No. 27 & n.1.) Rather, Hayden-Murphy's briefing skips over the crucial step of identifying actual conflicts of law altogether and simply argues that Minnesota law should apply regardless of what Tennessee law says. Technically, the court might be able to end its choice-of-law analysis there, with Hayden-Murphy having failed to identify any specific choice that must be made. Because of the centrality of these statutes to this case, however, the court will go forward with its analysis in the interest of establishing which state's statute should govern this dispute.

Wirtgen argues that the court should apply Tennessee law because, among other things, Tennessee's statute, even if different from Minnesota's in some (mostly cosmetic) respects, is not contrary to a fundamental public policy of Minnesota and was therefore validly selected by the parties to govern their dealings. Tennessee's "fundamental policy" rule tracks the Restatement (Second) of Conflict of Law, which explains that, "[t]o be 'fundamental,' a policy must . . . be a substantial one." Restatement (Second) of Conflict of Laws § 187. The Tennessee caselaw defining the term "fundamental policy" for choice-of-law purposes is not particularly robust, but it confirms that not every difference between jurisdictions rises to the level of implicating that standard. For example, the Tennessee Court of Appeals, applying North Carolina's similar choice-of-law rules, has stated that, for a law to be contrary to the public policy of a state, it "must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state." *Williams v. Smith*, 465 S.W.3d 150, 157 (Tenn. Ct. App. 2014) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 857 (1988)).

13

Case 3:22-cv-00308   Document 31   Filed 01/06/23   Page 13 of 24 PageID #: 296

The court cannot conclude that the parties' choice of law provision is contrary to a fundamental public policy of Minnesota for the purposes of this case. Hayden-Murphy argues, in essence, that applying Tennessee's law must, in and of itself, be against the public policy of Minnesota, because Minnesota's equipment distributor statute expressly forbids contractually waiving its protections. *See* Minn. Stat. Ann. § 325E.0683. At most, though, that provision only establishes that waivers of distributors' statutory rights are impermissible under Minnesota law—not that any aspect of that arrangement amounts to a "fundamental policy." In any event, a Tennessee choice of law provision would only be a waiver of rights under the Minnesota statute to the extent that the Minnesota statute actually offers rights that Tennessee's does not. It is not clear to the court, though, that Minnesota's statute is actually significantly more protective of dealers. While there may be, as the court has noted, some differences in language, Hayden-Murphy, as the party advocating for the application of Minnesota law, has not argued that there is any meaningful substantive difference between the statutes as applied to this case. Hayden-Murphy has therefore failed to identify any aspect of the Minnesota statutory scheme that would be unlawfully waived by a Tennessee choice-of-law provision—let alone that any such provision was "fundamental."

Minnesota's statute does appear to reflect a concern about unequal bargaining power, which is an important consideration. *See Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001) ("[T]he purpose of [the statute] is to protect the dealer, who is often in a weaker bargaining position . . . ."). According to the Restatement, a policy is more likely to be found to be fundamental if a law is "designed to protect a person against the oppressive use of superior bargaining power," such as in the case of "[s]tatutes involving the rights of an individual insured as against an insurance company." *Id.* HUEMDA qualifies as such a law. The

14

importance of that fact, however, is undermined significantly by the fact that Tennessee's statute also takes the parties' unequal bargaining power into account—in much the same way that Minnesota's does. Each statute reflects a legislative decision to make it significantly more demanding for a manufacturer to end a distribution agreement unilaterally, and the states' respective provisions differ, at most, in the details of how that approach is to be carried out. There is simply not enough tension between Tennessee's statute and Minnesota's to find an issue of fundamental policy at stake. Indeed, the district court opinion on which Hayden-Murphy most strongly relies in support of its position tellingly included no "fundamental policy" analysis and engaged in no comparison between the Minnesota statute and the other state's laws to determine the scope and nature of any differences. *See Interstate Power Sys., Inc. v. Gen. Elec. Co.*, No. CIV. 11-2564 DWF/JSM, 2011 WL 5025275, at *2 n.2 (D. Minn. Oct. 21, 2011).

Ultimately, Hayden-Murphy's argument puts the cart before the horse. Hayden-Murphy argues that the court should apply Minnesota law because Minnesota law—specifically, the anti-waiver provision of its equipment distribution statute—says that it should. Minnesota's laws, though, are only significant to this court insofar as Tennessee choice-of-law principles say that they are. No state has the unilateral power to legislatively nullify the choice-of-law principles of other states. To the contrary, "[t]he only way that the [laws] of any particular state can make a choice of law clause void is if that particular state's law applies to the matter before the Court" in the first place. *Momentum Mktg. Sales & Servs., Inc. v. Curves Int'l, Inc.*, No. W-07-CA-048, 2008 WL 11334569, at *2 (W.D. Tex. Dec. 17, 2008). Minnesota's anti-waiver statute therefore does not, and could not, relieve the court of its duty to perform an ordinary choice-of-law analysis, including the steps that Hayden-Murphy has skipped.

15

Under Tennessee's ordinary choice-of-law principles, Minnesota law could only apply here, if at all, if this case implicated a disjunction between Tennessee law and Minnesota law such that applying Tennessee law—as the parties agreed, in their contract, that a court hearing a dispute between them should—would rise to the level of threatening a "fundamental policy" of Minnesota. Minnesota's mere preference that its law apply, combined with minor differences between the statutes that might not even be implicated here, are not enough for the court to disregard the agreed-upon decision by the parties for their relationship to be governed by Tennessee law. The court therefore will apply the contract as written and look to the law of the State of Tennessee.

## B. Failure to Renew

Wirtgen argues, first, that there is no need to consider whether it had good cause to terminate the parties' relationship, because it had an absolute right not to renew their contract for any reason. According to Wirtgen, its argument poses "a straightforward question of statutory interpretation: does a supplier 'fail' to renew a distributor agreement . . . when it allows the agreement to expire at the end of its term as expressly permitted by the agreement?" (Doc. No. 25 at 1.). Wirtgen suggests that the answer is "no," because one can only "fail" to renew a contract if one has a duty to do so; otherwise, a nonrenewal would just be a nonrenewal—not a "failure to renew." Hayden-Murphy also sees the question of construing "fail to renew" as fairly simple—but with a different answer. According to Hayden-Murphy, "fail to renew" clearly refers to any refusal to renew a renewable contract. Indeed, Hayden-Murphy argues that Wirtgen's interpretation of the statute is "illogical," because, "[i]f, as Wirtgen suggests, the statute only prevents a failure to renew when there is [already] an obligation to renew, there would be no need for the statute. Such a situation would be a breach, and the statute would not protect anything, and would be useless." (Doc. No. 27 at 4.)

16

Under Tennessee law, a court's "role in statutory interpretation is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." *New v. Dumitrache*, 604 S.W.3d 1, 14 (Tenn. 2020) (quoting *State v. L.W.*, 350 S.W.3d 911, 916 (Tenn. 2011)). In so doing, the court must be guided by the "plain and ordinary meaning of the statutory language." *Id.* The court's interpretation of the statute, however, must be performed against a backdrop of preexisting legal concepts and principles of which the General Assembly is presumed to have been aware. *See Brundage v. Cumberland Cnty.*, 357 S.W.3d 361, 365 (Tenn. 2011) (stating that the General Assembly is presumed to know the "state of the law") (quoting *Seals v. H & F, Inc.*, 301 S.W.3d 237, 242 (Tenn. 2010)). Among those principles is the general rule that, "[u]nder the law, perpetual obligations are disfavored." *Open Lake Sporting Club v. Lauderdale Haywood Angling Club*, 511 S.W.3d 494, 501 (Tenn. Ct. App. 2015) (quoting *Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Loc. No. 3-677*, 811 S.W.2d 875, 881 (Tenn. 1991)). That does not mean that the General Assembly is powerless to impose such obligations. Rather, the court simply must construe the statute as written, but with an understanding that, because it represents a departure from Tennessee's ordinary policy and the common law, some caution is warranted. *See In re Est. of Starkey*, 556 S.W.3d 811, 817 (Tenn. Ct. App. 2018) ("Although the General Assembly has the constitutional and legislative authority to abrogate the common law, the intention to abrogate must be clear.") (citing *State v. Howard*, 504 S.W.3d 260, 270 (Tenn. 2016)).

The court therefore begins, as it ordinarily would, with the language of the statute. Wirtgen argues that the dictionary definition of "failure" supports its position that one can only "fail to" do something if one was required to do it. Accordingly, a failure to renew could only occur if a supplier/manufacturer was required to renew the contract for some reason other than Tenn. Code Ann. § 47-25-1302—presumably, some provision of the contract itself creating a renewal

obligation. Aside from a few cherry-picked examples, however, Wirtgen's assertion that dictionaries support its narrow reading is simply not true. To the contrary, dictionary entries of the relevant words are replete with definitions that would support Hayden-Murphy's position that "fail" can, in fact, refer to not performing an action, even if there was no duty to perform it. For example, "[f]ailure" can refer to a "[d]efficiency," "lack," or "want" of something or it can refer, more specifically, to "[a]n omission of an expected action, occurrence, or performance." FAILURE, Black's Law Dictionary. "To fail" can mean "to fall short of achieving something expected or hoped for," or "[t]o lapse." FAIL, Black's Law Dictionary. Indeed, even many of the definitions that Wirtgen cites in support of its position do not actually support as narrow a definition as Wirtgen suggests. For example, one cited definition refers to a failure to "do something that you should do or are expected to do." (Doc. No. 25 at 14–15 (quoting Britannica Dictionary). Another definition cited by Wirtgen refers to the failure to "do[] something that you must do *or* are expected to do." (*Id.* (quoting Cambridge Dictionary) (emphasis added).) Each of those definitions expressly reaches some situations other than the failure to do something one had an actual duty to do.

Admittedly, these dictionary definitions confirm that "fail to" is not simply a value-neutral synonym for "do not." Rather, "[i]n its customary and preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something." *Williams v. Taylor*, 529 U.S. 420, 431 (2000). "Failure," in other words, typically implies the existence of some desired or desirable threshold that was not met—such as in failing to meet a quota or failing to check the weather before walking out the door. That, though, is a far broader concept than Wirtgen's narrow definition of "fail" as referring only to failures associated with actual legal duties. From the perspective of a distributor that wishes to continue its distributorship, it makes

18

perfect sense to lament that a manufacturer or supplier "failed" to renew the parties' agreement—whether the manufacturer had a contractual duty to do so or not. That is particularly true, given that Tenn. Code Ann. § 47-25-1302 only forbids nonrenewal that is without good cause and/or sufficient notice. Ending an important business relationship without good cause or sufficient warning could fairly be characterized as a "failure" without stretching the definition of that word at all—whereas defining "failure" to refer only to failure to perform a legal duty would constrict the definition considerably.

Courts that have considered the same or similar language have generally shared the reading that "fail to renew" refers simply to a decision not to renew a renewable contract that the other party to that contract wishes to be renewed. For example, the New Jersey Supreme Court interpreted a provision making it unlawful for a franchisor to "terminate, cancel or fail to renew a franchise without good cause" as granting the franchisee the equivalent of an "'infinite' franchise" that "cannot be . . . refused renewal" without a qualifying reason. *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d 66, 76 (N.J. 1985); *accord BP Prod. N. Am., Inc. v. Hillside Serv., Inc.*, No. CIV. 9-4210, 2011 WL 4343452, at *3 (D.N.J. Sept. 14, 2011). The Indiana Supreme Court has construed "fail to renew," as used in that state's franchise statute, to mean "not renew[]." *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.*, 669 N.E.2d 134, 139 (Ind. 1996). The District Court for the Southern District of Iowa construed Iowa's own franchise statute—which, at the time, used "refuse to renew," 1992 Ia. Legis. Serv. 1134 (H.F. 2362)—in the same way, *McDonald's Corp. v. Nelson*, 822 F. Supp. 597, 604 (S.D. Iowa 1993), and the Eight Circuit not only affirmed the district court but expressly praised its "detailed and well-considered opinion," *Holiday Inns Franchising, Inc. v. Branstad*, 29 F.3d 383, 384 (8th Cir. 1994). In *State Farm Mutual Auto Insurance Co. v. Brown*, 115 Cal. Rptr. 213 (Cal. Ct. App. 1974), the California

19

Court of Appeal considered the phrase "fail to renew," as it is used in that state's insurance laws, at length and construed it to refer to the insurer's decision "not to renew." *Id.* at 220. The Appellate Court of Illinois similarly construed "fail to renew," as used in its insurance statutes, to mean "not to renew." *Librizzi v. State Farm Fire & Cas. Co.*, 603 N.E.2d 821, 827 (Ill. App. 1992).

Wirtgen nevertheless cites to various judicial opinions and statutes that have discussed "failure" in the context of specific legal obligations. (*See* Doc. No. 25 at 17, 20.) Those citations, however, do little to support Wirtgen's position, because no one disputes that failure to comply with an obligation is *one way* that a person or entity can "fail." For Wirtgen to prevail on this argument, it needs to establish that, in the context of Tenn. Code Ann. § 47-25-1302, failure to comply with a contractual duty to renew is the *only way* a party can fail to renew. The ordinary usage of the word, however, does not support that reading. Indeed, the fact that the cases and statutes that Wirtgen cites rely on additional language to make clear what type of failure they are describing—e.g., "fail[ing] *to pay an assessment when due*," Tenn. Code Ann. § 56-12-210(b) (emphasis added)—illustrates the fact that "failure" is a broad, even generic, concept that can be applied to many types of actions. The action described in Tenn. Code Ann. § 47-25-1302 is failing to renew a contract, and this court will apply it accordingly, without imposing limitations that appear nowhere in the text.

That broader reading of "fail to renew" is also more consistent with the overall approach embodied by Tenn. Code Ann. § 47-25-1302. Wirtgen envisions that statute as only coming into play in the context of a renewal decision if there is a preexisting contractual duty to renew. But imposing additional, non-contractual obstacles to ending the relevant parties' relationship is precisely what Tenn. Code Ann. § 47-25-1302 is drafted to do. For example, a contract may grant the manufacturer a unilateral right of termination, but Tenn. Code Ann. § 47-25-1302, by its plain

20

language, would impede that right by adding additional, non-contractual requirements of good cause and advance notice. There is, therefore, nothing unusual about the prospect of Tenn. Code Ann. § 47-25-1302 also imposing additional, non-contractual obstacles to nonrenewal. If anything, it would be more unusual if the statute abandoned its standard approach to permit parties to, in effect, contract around its requirements by simply recharacterizing a termination right as a right not to renew. The reading of Tenn. Code Ann. § 47-25-1302 that is most consistent with the statute as a whole is therefore the same as the one that is most consistent with the plain language: that "fail to renew" refers to a decision not to renew a renewable contract, whether or not there would be a duty to renew in the absence of Tenn. Code Ann. § 47-25-1302—which itself imposes such an obligation in the absence of good cause.

A final potential complication of applying that definition in this case is the fact that the renewal provision in these parties' contract was bilateral, meaning that whether to renew was not solely Wirtgen's decision to make. That distinction might be relevant under some facts; for example, it is difficult to see how a manufacturer or supplier could have an obligation to demonstrate good cause if it was the distributor itself that wanted to end the parties' relationship. In this case, however, Hayden-Murphy did consent to renewal, and Wirtgen therefore faced the same contractual renewal/nonrenewal decision it would have had under a contract that did not expressly require the distributor's consent for renewal. Nothing in the meaning of the phrase "fail to renew" suggests that it would exclude such a situation. The court therefore concludes that the notice and good cause requirements of Tenn. Code Ann. § 47-25-1302 would apply to any decision by Wirtgen not to renew the parties' contract over Hayden-Murphy's objection.

**C. Good Cause**

Wirtgen argues that, if the court holds that the good cause requirement does apply to any decision by Wirtgen not to renew the parties' contract, the court should nevertheless permit Wirtgen's claim for declaratory relief to proceed because it did, in fact, have good cause based on a substantial change in the ownership or control of Hayden-Murphy without Wirtgen's consent. Specifically, Wirtgen points to the assertion, in its Amended Complaint, that, "[o]n August 13, 2018, Hayden-Murphy's then CEO, Len Kirk, sent Wirtgen a letter informing Wirtgen of a substantial change in the control of Hayden-Murphy and the loss of managers, officers, and key employees within Hayden-Murphy, including, but not limited to, himself, who was stepping down as CEO after 30 years of service." (Doc. No. 18 ¶ 26.) Wirtgen also cites its letters to Hayden-Murphy clearly expressing concern about Kirk's departure and declining to consent to that change. Those letters, Wirtgen argues, not only confirm the basis for its good cause but serve as more than adequate notice, should Wirtgen end the parties' agreement in the future—which, Wirtgen points out, it has not yet done.

Hayden-Murphy argues first that Wirtgen has not sufficiently pleaded that the departure of Kirk and unnamed others actually rose to the level of good cause under Tenn. Code Ann. § 47-25-1302. That argument, though, hinges on the mistaken assumption that Wirtgen was required to plead certain magic words about the extent of Kirk's ownership and/or control of Hayden-Murphy. Wirtgen's Complaint clearly alleges that Kirk exercised substantial control over Hayden-Murphy, and the supporting materials, which are incorporated into the Amended Complaint, confirm that he was a part owner who relinquished his share of ownership in connection with his retirement. There may well be room to debate whether Kirk's ownership or control over Hayden-Murphy was actually "substantial," but that is a factual question that the court cannot resolve at this stage. Wirtgen's failure to specifically use particular keywords, however, is inconsequential.

22

Hayden-Murphy argues next that, insofar as Kirk's departure might have, at one time, qualified as good cause to terminate or decline to renew the contract, the substantial delay between that departure and any attempt by Wirtgen to end the relationship renders that good cause no longer effective, on the ground that Wirtgen either waived its termination/nonrenewal right by delay or implicitly consented to the change by continuing to do business with Hayden-Murphy—and renewing the contract for additional terms—long after that change was made. Wirtgen responds that any such argument is inappropriate for resolution in connection with a motion to dismiss.

"Waiver is an affirmative defense," and "[a] party who raises the issue of waiver has the burden of proving it by a preponderance of the evidence. *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009) (citing 9 Tenn. R. Civ. P. 8.03; *Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 722 (Tenn. Ct. App. 1998)); *see also GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 202 (Tenn. Ct. App. 2010) ("[W]aiver is defensive in nature, in that it is ordinarily raised as a defense . . . ."). "[A] motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon" a defense that hinges on facts that the complaint was not required to plead. *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Because this case involves a request for declaratory judgment, rather than a more straightforward claim for breach of contract, the question of what qualifies as a "defense" may be somewhat more complex. Abstract issues of terminology aside, however, the argument that waiver and implied consent are too fact-intensive and too distinct from Wirtgen's Rule 8 pleading obligations to consider based on the Amended Complaint alone is persuasive.

Nothing in the pleaded facts suggests that any express verbal waiver occurred. To the contrary, the correspondence between the parties suggests that, if anything, Wirtgen took

affirmative steps to avoid the impression that it was waiving its rights through its delay. Any waiver or implied consent therefore must have been by action and/or inaction. Typically, such a finding must be based on a showing of "some 'absolute action or inaction inconsistent with the claim or right' waived.'" *Old Hickory Coaches, LLC v. Star Coach Rentals, Inc.*, 652 S.W.3d 802, 819 (Tenn. Ct. App. 2021) (quoting *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009)). The court cannot decide, from the Amended Complaint, whether any such absolute action or inaction occurred, because the court is almost entirely lacking in context regarding the parties' relationship and the norms of their industry. It might be the case that declining to terminate (or refuse to renew) the parties' agreement for the first few years after good cause allegedly arose did, in context, amount to a clear waiver. The court, however, cannot assume that that was the case. Certainly, the facts stated in the Amended Complaint do not mandate that conclusion. Dismissing Wirtgen's claim at this stage based on the assumption that it waived its rights would therefore be inappropriate.

## IV. CONCLUSION

For the foregoing reasons, Hayden-Murphy's Motion to Dismiss (Doc. No. 24) will be denied.

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

24