# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WIRTGEN AMERICA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00308** |
| | ) | **Judge Aleta A. Trauger** |
| **HAYDEN-MURPHY EQUIPMENT** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Wirtgen America, Inc. ("Wirtgen") has filed a Motion for Judgment on the Pleadings on Certain Counterclaims, to Dismiss the Remaining Counterclaims as Unripe, and to Strike Hayden-Murphy's Affirmative Defense of Waiver (Doc. No. 47), to which Hayden-Murphy Equipment Company ("Hayden-Murphy") has filed a Response (Doc. No. 49), and Wirtgen has filed a Reply (Doc. No. 50). Wirtgen has also filed a Motion for Leave to File Third Amended Complaint (Doc. No. 55), to which Hayden-Murphy has filed a Response (Doc. No. 57), and Wirtgen had filed a Reply (Doc. No. 59). For the reasons set out herein, the court will grant Wirtgen judgment on the pleadings in part, deny it judgment on the pleadings in part, deny Wirtgen's request for dismissal of some claims for lack of jurisdiction, deny Wirtgen's request to strike a defense, and grant Wirtgen leave to file a Third Amended Complaint.

# I. BACKGROUND[1]

Many states, including Tennessee, have enacted statutory protections designed to restrict manufacturers' and suppliers'[2] ability to exert improper leverage over the retailers who rely on those manufacturers and suppliers for their products. In so doing, those statutes, by necessity, restrict the parties' ordinary freedom of contract. For example, Tenn. Code Ann. § 47-25-1302 requires that "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause," even if the parties' contract says otherwise. Tenn. Code Ann. §§ 47-25-1302(a), -1312. The statute defines "good cause" to refer, first, to any "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." Tenn. Code Ann. § 47-25-1302(a). The statute then lists a series of additional events that qualify as "good cause" as a matter of law, including the loss or retirement of "a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder." Tenn. Code Ann. § 47-25-1302(a)(6). Good cause, however, "does not exist if the supplier consents to" the qualifying change in leadership. *Id.*

Wirtgen is a Tennessee-based supplier of road construction and surface mining equipment. The end users of Wirtgen's goods are typically contractors or governments, who buy or rent the equipment they need through Wirtgen's network of independent dealers. (Doc. No. 33 ¶¶ 12–14.) Hayden-Murphy is one such dealer. On January 1, 2010, Wirtgen and Hayden-Murphy entered

---

[1] Unless otherwise indicated, these facts come from Wirtgen's Second Amended Complaint for Declaratory Judgment (Doc. No. 33) and are taken as true for the purposes of the pending motions.

[2] "Supplier," in this context, refers to a company that sells goods to distributors, much as a manufacturer would, but which is not necessarily the entity that actually manufactured those goods. For present purposes, the distinction between manufacturer and non-manufacturer supplier is of no importance.

2

into a Distributor Sales and Service Agreement, whereby Hayden-Murphy agreed to be a non-exclusive dealer of various lines of Wirtgen products in Minnesota. (*Id.* ¶¶ 15–16; Doc. No. 33-2.) Pursuant to that agreement, Wirtgen—which the agreement refers to as "Company," with Hayden-Murphy being referred to as "Distributor"—made certain assurances regarding Hayden-Murphy's geographic territory:

> Company shall not negotiate with or sell Equipment or Parts directly to any customer in the Area of Primary Responsibility whose business operations lie exclusively within the area of primary responsibility as designated in Schedule B. Company reserves the right to negotiate with and sell Equipment and Parts directly to any customer in the Area of Primary Responsibility, which Company designates as a national account ("National Account"), or which conducts any business operations outside the area of primary responsibility ("Major Account"). Distributor shall receive a mutually agreed amount of compensation from Company for certain sales of certain items of Equipment that are sold by Company directly to customers in order to compensate Distributor for providing service on any such Equipment sold by Company.

(*Id.* at 10.)

The agreement states that it is "renewable annually upon the consent of both parties." (*Id.* at 16.) If the parties mutually agree to terminate the contract, they may do so at any time. (*Id.*) Otherwise, a decision by one party to terminate the contract must comply with certain procedures. Under the terms of the contract as written, either Wirtgen or Hayden-Murphy "may terminate this Agreement at any time, with or without cause, upon sixty (60) days written notice to the other party." (*Id.*) However, the Agreement grants Wirtgen accelerated termination rights in certain situations. Specifically, there is a list of nine occurrences that, if they come to pass, grant Wirtgen a right to immediately terminate the agreement upon written notice, and there is a second list of ten other occurrences that would grant Wirtgen the "right to terminate this Agreement upon thirty (30) days written notice and opportunity to cure." (*Id.* at 17–18.) Among the events giving rise to a 30-day-notice termination right are the following:

3

c. Any dispute, disagreement or controversy between or among the principles, parties, managers, officers or stockholders of [Hayden-Murphy] or any loss of managers, officers or key employees through termination of employment or otherwise, which in the commercially reasonable judgment of [Wirtgen] may adversely affect the business of [Hayden-Murphy] or [Wirtgen]; . . .

j. A substantial change in the ownership or control of [Hayden-Murphy] without prior written consent of Wirtgen.

(*Id.* at 18.) All of the aforementioned termination rights are, however, potentially subject to additional restriction by the applicable laws of a state that, like Tennessee, does not permit retailers and suppliers to contract out of its baseline statutory framework for such relationships. *See* Tenn. Code Ann. § 47-25-1312.

The Distributor Sales and Service Agreement includes a provision forbidding Hayden-Murphy from selling, assigning, delegating, or otherwise transferring any of its "rights or obligations" under the agreement. (*Id.* at 25–26.) Although this case does not involve assignment of Hayden-Murphy's rights in the ordinary sense, the Distributor Sales and Service Agreement defines "assignment" broadly to include some events that are relevant to this case:

Company has entered into this Agreement in reliance upon the representations and personal abilities of the current owners and managers of Distributor. The parties agree that the rights conferred on Distributor by this Agreement are contingent upon the continuation of the present owners and managers of Distributor. Any merger, consolidation, transfers of assets, event or transaction which results (whether by operation [of] law or otherwise) in a change of ownership or control of Distributor or Distributor's business shall be deemed an assignment by Distributor for purposes of this Agreement.

(*Id.* at 26.)

Finally, the contract includes the following choice-of-law provision, which also addresses the issue of how the contract should be construed if any of its provisions are found to be unlawful:

This Agreement shall be construed, interpreted and enforced in accordance with the laws of the state of Tennessee. Any action between Company and Distributor shall be filed either in the United States District Court for the Middle District of Tennessee or in the Chancery Court for Davidson County, Tennessee, and the

4

parties hereby consent to the jurisdiction and venue of the foregoing courts. If the performance of any obligation or the exercise of any right pursuant to this Agreement would be unlawful, such performance or exercise shall be modified to the minimum extent necessary to comply with such law, without invalidating the remainder of this Agreement.

(Doc. No. 33-2 at 25.)

On August 13, 2018, Hayden-Murphy's then-CEO, Len Kirk, sent Wirtgen a letter, informing Wirtgen that Hayden-Murphy was in the process of what Wirtgen describes as a "substantial change in the control of Hayden-Murphy and the loss of managers, officers, and key employees within Hayden-Murphy, including, but not limited to, [Kirk] himself, who was stepping down as CEO after 30 years of service." (Doc. No. 33 ¶ 28.) On September 6, 2018, Kirk met with Wirtgen President James P. McEvoy and Vice President of Dealer Development Brodie Hutchins to discuss matters including the turnover in Hayden-Murphy's leadership. McEvoy and Hutchins expressed their dismay at the changes and, in particular, at the fact that Wirtgen had not received more advance notice of the transition. (*Id.* ¶ 29.) McEvoy and Hutchins informed Kirk that Wirtgen "did not approve or consent to the changes that were being made." (*Id.* ¶ 30.)

Despite the concerns that Wirtgen raised in 2018, the parties' relationship remained formally intact for the ensuing few years, during which the parties continued to renew the Distributor Sales and Service Agreement. However, on April 8, 2022, McEvoy sent Hayden-Murphy President Don Knackstedt a letter informing him that "Wirtgen strongly believe[d] that the time ha[d] come to allow each of [the two] companies to pursue its business objectives separately." (Doc. No. 33-4 at 4.) Knackstedt sent a letter in response, which Wirtgen received around April 27, 2022. (Doc. No. 18 ¶ 34; Doc. No. 18-5.) Knackstedt stated that, in Hayden-Murphy's view, "Wirtgen cannot simply non-renew the Agreement, and[,] instead, there must be 'good cause' to terminate . . . ." (Doc. No. 18-5 at 2.)

On April 28, 2022, Wirtgen filed a Complaint for Declaratory Judgment against Hayden-Murphy in this court. (Doc. No. 1.) That Complaint was superseded by an Amended Complaint on July 15, 2022. (Doc. No. 18.) Wirtgen asked the court to declare that:

> (a) Wirtgen has the right to allow the Agreement to expire at the end of this calendar year by not consenting to its renewal and (b) Wirtgen has the right to terminate the Agreement as of the end of this calendar year as a result of (i) a substantial change in the control of Hayden-Murphy without Wirtgen's consent, (ii) a change in the managers of Hayden-Murphy without Wirtgen's advance approval, and/or (iii) a loss of managers, officers, or key employees which, in Wirtgen's commercially reasonable judgment, may adversely affect the business of Hayden-Murphy or Wirtgen.

(Doc. No. 18 ¶ 37.)

On July 29, 2022, Hayden-Murphy filed a Motion to Dismiss (Doc. No. 24), which the court denied. (Doc. No. 31.) The court held first that Hayden-Murphy, which had argued that the court should apply Minnesota law, had failed to establish a sufficient basis for disregarding the parties' contractual choice-of-law provision selecting Tennessee law to govern their relationship. (*Id.* at 16.) The court held next that Tennessee's distributorship statutes imposed a good cause requirement on Wirtgen's power to refuse to renew its relationship with Hayden-Murphy. (*Id.* at 21.) Finally, the court held that Wirtgen had sufficiently pleaded that it had a right to end the parties' relationship for good cause. (*Id.* at 24.) Shortly thereafter, Wirtgen, with the consent of Hayden-Murphy, filed a Second Amended Complaint for Declaratory Judgment. (Doc. No. 33; *see* Doc. No. 34.)

On February 17, 2023, Hayden-Murphy filed its Answer, Affirmative Defenses, and Counterclaims. (Doc. No. 39.) Reflecting the parties' disagreement regarding choice of law, some of the eight counterclaims rely on Tennessee law, while some rely on the law of Minnesota, where Hayden-Murphy does business. Counterclaim 1 is based on Wirtgen's threatened violation of the good cause requirement for termination under the Minnesota Heavy and Utility Equipment

6

Manufacturers and Dealers Act ("MHUEMDA"), Minn. Stat. Ann. § 325E.0681(1). (*Id.* ¶¶ 70–80.) Counterclaim 2 states a similar claim pursuant to Tennessee's good cause termination requirement governing retail agreements, Tenn. Code Ann. § 47-25-1302(a). (*Id.* ¶¶ 81–90.) Counterclaim 3 is another MHUEDMA claim, this time based on Wirtgen's having "attempt[ed] or threaten[ed] to terminate, cancel, [or] fail to renew . . . the dealership agreement . . . based on . . . circumstance[s] beyond the dealer's control," Minn. Stat. Ann. § 325E.0682(b)(4). (*Id.* ¶¶ 91–97.) Counterclaim 4 states the same general theory of liability pursuant to the corresponding Tennessee statute regarding circumstances beyond a retailer's control, Tenn. Code Ann. § 47-25-1304(4). (*Id.* ¶¶ 98–104.) Counterclaim 5 is for breach of contract, based on the allegation that "Wirtgen has authorized and is selling equipment and parts to dealers located in Hayden-Murphy's Areas of Primary Responsibility (i.e. the entire State of Minnesota) in breach of the parties' Agreement." (*Id.* ¶¶ 105–15.) Counterclaim 6 is a third MHUEDMA claim, based on Wirtgen's "substantially chang[ing] the competitive circumstances of" Hayden-Murphy, Minn. Stat. Ann. § 325E.0681, by working with other dealers in Hayden-Murphy's territory. (*Id.* ¶¶ 116–25.) Counterclaim 7 restates that theory of liability pursuant to Tennessee law. (*Id.* ¶¶ 126–35.) Counterclaim 8 is for violation of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 136–50.)

On March 23, 2023, Wirtgen filed an Answer to the Counterclaims (Doc. No. 46), as well as a Motion for Judgment on the Pleadings on Certain Counterclaims, to Dismiss the Remaining Counterclaims as Unripe, and to Strike Hayden-Murphy's Affirmative Defense of Waiver (Doc. No. 47). Wirtgen argues that the court should dismiss Counterclaims 1, 3, and 6 because they are "based on Minnesota law, which the Court has already ruled does not apply in this action." (Doc. No. 47 at 1.) Wirtgen argues that Counterclaims 2, 4, and 8 should be dismissed as unripe, because

7

they are "predicated on Wirtgen ending its contractual relationship with Hayden-Murphy, which Wirtgen has not done and will not do until its right to do so is confirmed by the Court." (*Id.* (emphasis omitted).) Finally, Wirtgen argues that the court should dismiss Counterclaims 5 and 7 because each claim depends on the mistaken assumption that Wirtgen was barred by the parties' agreement from selling to other Minnesota-based dealers, when, in fact, Wirtgen was merely barred from conducting its own direct sales in Minnesota. (*Id.* at 1–2.)

In addition to those requests for dismissal of counterclaims, Wirtgen also asks the court to strike Hayden-Murphy's First Affirmative Defense, which alleges that Wirtgen "waived any contractual right that may have existed to pursue termination or non-renewal of the parties' Agreement for an asserted breach of the parties' contract." (Doc. No. 39 at 6.) Wirtgen argues that any such defense is barred by the provision in the Distributor Sales and Service Agreement barring waiver by nonenforcement. (Doc. No. 47 at 2.)

On July 31, 2023, the day before the court's deadline for seeking leave to amend pleadings (Doc. No. 42 at 4), Wirtgen filed a Motion for Leave to File Third Amended Complaint. (Doc. No. 55.) Wirtgen asserts that it has learned, during discovery, that Hayden-Murphy experienced several additional not-consented-to changes in its leadership capable of triggering Wirtgen's termination rights, and Wirtgen now wishes to plead facts in relation to those changes. (Doc. No. 55 at 2.) Hayden-Murphy responds that the proposed amendments would be "futile and duplicative" and that the court, therefore, should deny leave to amend. (Doc. No. 57 at 1.)

## II. REQUEST TO STRIKE DEFENSE

### A. Legal Standard

Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may "order any redundant, immaterial, impertinent, or scandalous matter stricken from any pleading, motion, or

other paper." Fed R. Civ. P. 12(f). However, courts construing and applying Rule 12(f) have followed the rule that "[a] motion to strike is a drastic remedy that should be used sparingly and only when the purposes of justice require." *Driving Sch. Assoc. of Ohio v. Shipley*, No. 1:92-CV-00083, 2006 WL 2667017, at *1 (N.D. Ohio 2006) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).

A motion to strike an affirmative defense under Rule 12(f) "is proper if the defense is insufficient; that is, if 'as a matter of law, the defense cannot succeed under any circumstances.'" *S.E.C. v. Thorn*, No. 2:01-CV-290, 2002 WL 31412440, *2 (S.D. Ohio 2002) (quoting *Ameriwood Indus. Int'l Corp. v. Arthur Andersen & Co.*, 961 F. Supp. 1078, 1083 (W.D. Mich. 1997)). A motion to strike should not be granted "if the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits." *United States v. Pretty Prods. Inc.*, 780 F. Supp. 1488, 1498 (S.D. Ohio 1991) (quoting 5A Wright & Miller, Fed. Prac. & Proc. § 1380 (1990)). The court "may only strike those defenses 'so legally insufficient that it is beyond cavil that defendants could not prevail on them.'" *Id.* (citation omitted). The decision whether to strike an affirmative defense is within the discretion of the district court. *See Conocophillips Co. v. Shaffer*, No. 3:05 CV 7131, 2005 WL 2280393, at *2 (N.D. Ohio 2005).

**B. Analysis**

Wirtgen argues that the court should strike Hayden-Murphy's affirmative defense of waiver as insufficient. Wirtgen does not dispute that, ordinarily, the question of whether a party in its position waived its contract termination rights by failing to act on them would require a "fact-intensive inquiry inappropriate for resolution at the pleadings stage." (Doc. No. 48 at 14.) That factual inquiry is unnecessary in this case, Wirtgen argues, because the Distributor Sales and Service Agreement includes the following anti-waiver provision:

9

The failure of either party to enforce at any time any provision of this Agreement shall not be construed as a waiver of that provision or of the right of that party to enforce the provision in the future. No departure from this Agreement shall permit any subsequent departure, and no waiver by either party of any term of this Agreement or of any breach thereof shall be deemed a waiver of such term or any subsequent similar breach.

(Doc. No. 18-2 at 25.) Wirtgen argues that, under the plain meaning of that term, it could not have waived its termination rights by failing to exercise them. *See, e.g.*, *Skurka Aerospace, Inc. v. Eaton Aerospace*, L.L.C., No. 1:08-CV-1565, 2011 WL 1135946, at *6 (N.D. Ohio Mar. 29, 2011) (holding that, under Ohio law, "a course of performance cannot override an anti-waiver provision").

Although there have, at times, been questions about the enforceability of some anti-waiver clauses, *see, e.g., Davenport v. Bates*, No. M2005-02052-COA-R3CV, 2006 WL 3627875, at *9 (Tenn. Ct. App. Dec. 12, 2006) (collecting cases), Hayden-Murphy does not dispute the general enforceability of this provision. Rather, Hayden-Murphy points out that much of the language of the provision is devoted to the question of whether a party's failure to enforce a provision in *one* instance should be treated as a waiver of the party's right to enforce the provision in a *second*, *later* instance. This case, however, is not about such a situation, but rather Wirtgen's right to exercise its *original* 2018 termination right at a later date. Hayden-Murphy argues that the anti-waiver provision is silent on that second situation and that ordinary waiver principles should apply.

If the anti-waiver provision consisted solely of its second sentence, Hayden-Murphy's argument might well be correct; that sentence is, at least arguably, focused on the specific problem of waiver arguments for "subsequent" violations. The first sentence, however, expressly states that "[t]he failure of either party to enforce at any time any provision of this Agreement shall not be construed as a waiver . . . of the right of that party to enforce the provision in the future." That language includes no qualification limiting it to future enforcement in connection with a

10

"subsequent" violation. Rather, the first half of the anti-waiver section of the agreement states that a failure to enforce a provision shall not be considered a waiver of *any* right to enforce that provision in the future. By its plain language, that would include future attempts to enforce the provision in connection with the same violation. The anti-waiver provision, therefore, bars the presentation of a waiver defense based entirely on one party's "failure to enforce" the agreement "at any time," whether that failure involved the same violation or a different one.

That conclusion, though, does not necessarily justify striking the defense. If waiver could not have occurred by inaction, then there are two other ways it could, in theory, have occurred: "by express declaration; or . . . by a course of acts and conduct." *Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 481 F.3d 337, 352 (6th Cir. 2007) (quoting *Reed v. Washington Cnty. Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn. 1988)). There is no plausible argument that waiver occurred, in this instance, by express declaration. Hayden-Murphy argues that the court could nevertheless conclude that waiver occurred through Wirtgen's ongoing affirmative acceptance of benefits under the contract and its consent to subsequent annual renewals.

There may, of course, be legal and factual obstacles to those defenses as well. Based on the pleadings and the current briefing, however, the only form of waiver that the court can affirmatively rule out is waiver based on inaction alone. Accordingly, while the court finds Wirtgen's interpretation of the anti-waiver provision's language more convincing than Hayden-Murphy's, the court cannot conclude that that reading would warrant an outright striking of the affirmative defense at this stage. Wirtgen has established that the parties' agreement would not permit the court to conclude that Wirtgen waived its right to terminate solely by failing to use that

11

right immediately, but it is possible that waiver occurred through Wirtgen's actions, rather than its omissions. Striking the defense would, therefore, be premature.

## III. RIPENESS OF COUNTERCLAIMS

### A. Legal Standard

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack "questions merely the sufficiency of the pleading," and the trial court therefore takes the allegations of the complaint as true. *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Because Wirtgen argues that Hayden-Murphy's claims, as pleaded, are unripe as a matter of law, its motion presents a facial challenge.

### B. Analysis

Wirtgen argues that Counterclaims 2, 4, and 8 should be dismissed as unripe. "The ripeness doctrine," as it has traditionally been understood, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Beech v. City of Franklin, Tenn.*, 687 F. App'x 454, 457 (6th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Recent cases have raised some doubt with regard to whether the latter, purely prudential aspects of ripeness continue to provide an independent basis for dismissing a case. *See Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 n.2 (6th Cir. 2017) (discussing questionable vitality of prudential ripeness in the wake of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014)); *see also Driehaus*, 573 U.S. at 167 (same); *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th Cir. 2018) (same); *but see Wyoming v.*

12

*Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (treating prudential ripeness as an exception to *Lexmark*). In Wirtgen's briefing, it stresses that its argument is focused on constitutional ripeness. (*See* Doc. No. 48 at 9.)

Constitutional ripeness overlaps significantly with the "injury-in-fact" requirement for constitutional standing. To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Constitutional ripeness focuses, in large part, on the same issues underlying element (1)(c) of that formulation. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

Wirtgen's reliance on constitutional ripeness may be due to the fact that the Tennessee statutes at issue specifically allow for at least *some* anticipatory enforcement, stating that a retailer plaintiff "shall be entitled to injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstances of the retail agreement." Tenn. Code Ann. § 47-25-1311(b). The intent of the Tennessee General Assembly, therefore, appears to be that a "retailer is entitled to injunctive relief to protect it against a violation of" the relevant statutes before that violation actually comes to pass. *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 939 (6th Cir. 2007). It is unlikely that a

court could rely on "prudential" considerations to disregard so clear a legislative intent. As the Supreme Court has made clear, however, even an unambiguous legislative grant of a cause of action does not relieve a plaintiff of the obligation to satisfy the Constitution's "case or controversy" requirement. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341, (2016). A focus on constitutional ripeness therefore allows Wirtgen to sidestep any argument that the Tennessee General Assembly intended to grant Hayden-Murphy a pre-breach cause of action. That focus, however, also lowers the bar that Hayden-Murphy must clear.

Generally speaking, "[t]hree factors guide the ripeness inquiry: '(1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.'" *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (quoting *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008)). There is no plausible argument that the possibility of Wirtgen's ending the parties' relationship is merely speculative. Wirtgen has informed both Hayden-Murphy and the court, many times, that it wishes to end the parties' relationship. As Wirtgen concedes, it is that very possibility that gives Wirtgen the power to seek declaratory judgment in the first place. The court therefore has no basis for concluding that the imminent injury on which Hayden-Murphy relies is constitutionally insufficient to give rise to jurisdiction.

Wirtgen does have a point that some of Hayden-Murphy's allegations appear to assume that Wirtgen has already violated Tennessee's statutes, as opposed to merely having threatened to do so. (See, e.g., Doc. No. 39 ¶ 88.) Insofar as Hayden-Murphy's claims appear flawed in this respect, however, it is an issue of characterization, not of substantive viability. The relevant Tennessee statute contemplates two potential causes of action by a retailer: (1) an "action for civil

14

damages . . . against any supplier found violating" the statute, Tenn. Code Ann. § 47-25-1311(a); and (2) an action for "injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change," Tenn. Code Ann. § 47-25-1311(b). The first of those options does appear to assume the occurrence of a prior violation of the relevant statutes. The second option, however, clearly does not. The court, accordingly, will construe Hayden-Murphy's claims as appropriately stating claims for protective injunctive relief, in the event that Hayden-Murphy is unable to establish any actual statutory violation. Such a claim is both statutorily permitted and ripe. There is, similarly, no fatal flaw in Hayden-Murphy's statement of its common law claim for breach of the covenant of good faith and fair dealing. The claim, as stated, cites a number of Wirtgen's actions under the contract, not merely its potential future termination. (*See* Doc. No. 39 ¶¶ 136–50.) The argument that Counterclaims 2, 4, or 8 can be dismissed simply because formal termination has not occurred is, therefore, without merit.

## IV. JUDGMENT ON THE PLEADINGS

### A. Legal Standard

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## B. Claims Pursuant to Minnesota Law

As the court explained in its prior opinion, when a federal court hears a diversity action, "the law of the forum state, including the choice-of-law rules, appl[ies]." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). This court therefore must apply Tennessee's rule that a contract is typically "presumed to be governed by the law of the jurisdiction in which it was executed" but that the parties can overcome that presumption by manifesting "a contrary intent." *Vantage Tech., LLC v. Cross*, 17 S.W. 3d 637, 650 (Tenn. Ct. App. 1999) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). The clearest and simplest way to manifest that contrary intent is by including an express choice-of-law provision in the relevant contract, *id.*, as Wirtgen and Hayden-Murphy did.

Tennessee's policy of honoring choice-of-law provisions, however, is not ironclad. To be enforceable, "[t]he choice of law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction, the basis for the jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Sw.*

16

*Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 n.8 (6th Cir. 2006) (citations omitted). As the court already held, there is no plausible argument that the Tennessee choice-of-law provision would fail any of the first three of those requirements, leaving the questions of (1) whether applying Tennessee law would be contrary to a "fundamental" public policy of Minnesota, (2) whether Minnesota law would "otherwise govern" the contract, and, (3) if so, whether Minnesota has a greater interest in the parties' relationship than Tennessee.

This court's earlier choice-of-law analysis focused on Hayden-Murphy's failure, in its earlier briefing, to identify a relevant, substantive difference between Tennessee law and Minnesota law that could be fairly characterized as "fundamental." Hayden-Murphy's briefing had focused instead on the fact that HUEMDA forbids contractual waivers, an argument that, the court wrote, "puts the cart before the horse," because "'[t]he only way that the [laws] of any particular state can make a choice of law clause void is if that particular state's law applies to the matter before the Court' in the first place." (Doc. No. 31 at 14 (quoting *Momentum Mktg. Sales & Servs., Inc. v. Curves Int'l, Inc.*, No. W-07-CA-048, 2008 WL 11334569, at *2 (W.D. Tex. Dec. 17, 2008)).) Accordingly, Wirtgen's position that the court has "already ruled" that Minnesota law "does not apply in this action" is something of an oversimplification. (Doc. No. 47 at 1.) A better characterization would be that the court held that Hayden-Murphy did not, at that time, identity a relevant difference between Tennessee and Minnesota law that would require the court to consider applying Minnesota law pursuant to Tennessee's "fundamental policy" test. The court's opinion, however, did not preemptively foreclose the possibility that such a difference could exist.

The Tennessee Court of Appeals, applying North Carolina's similar choice-of-law rules, has stated that, for a law to be contrary to the public policy of a state, it "must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice

17

to the people of the forum state." *Williams v. Smith*, 465 S.W.3d 150, 157 (Tenn. Ct. App. 2014) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 857 (1988)). Pursuant to that standard, there is reason to think that *if* there are significant differences between HUEMDA and Tennessee's statutes that bear on a particular situation, those differences might rise to the level of implicating a fundamental policy of Minnesota. As the court has previously noted, HUEMDA's apparent concern for the unequal bargaining power between manufacturers and retailers weighs in favor of the finding that the statute, broadly speaking, implicates issues of justice that could give rise to a fundamental policy difference. *See Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001) ("[T]he purpose of [the statute] is to protect the dealer, who is often in a weaker bargaining position . . . ."); *see* Restatement (Second) of Conflict of Laws § 187 (stating that a policy is more likely to be found to be fundamental if it is "designed to protect a person against the oppressive use of superior bargaining power"). One of the reasons that that fact is not, in and of itself, determinative of the choice-of-law issues in this case is that Tennessee's very similar laws reflect the same general concerns and address them in mostly similar ways. If, however, the states' approaches do diverge in a way that renders Tennessee law less protective of a retailer that would otherwise be entitled to the protection of Minnesota law, then there is a plausible argument that Tennessee choice-of-law principles would recognize Minnesota's superior interest.

Hayden-Murphy urges the court not to act prematurely and argues that "there are differences in the two statutes" that "could be outcome determinative." (Doc. No. 49 at 7.) Frustratingly, Hayden-Murphy remains vague regarding what differences it expects will or may be relevant to this case. It is correct, though, that the two statutes differ in some ways. The court has already pointed out one key difference: Minnesota's express reasonableness requirement for

18

withheld consent to changes in ownership or control. (*See* Doc. No. 31 at 12.) The court originally concluded that it was unlikely that that difference would be salient in this case. That low likelihood, however, is far from a certainty. Now, moreover, Wirtgen has, as the court will discuss more fully later in this opinion, alleged a number of additional changes in ownership or control, which could raise reasonableness issues of their own. There may, moreover, be latent differences in the laws that are not immediately apparent. Even where HUEMDA and the Tennessee statute use similar language, that language may mean something different as it would be interpreted by the Minnesota Supreme Court than it would as interpreted by the Tennessee Supreme Court.

"[T]he optimal timing for a choice-of-law determination is case-specific," and the mere fact that choice-of-law questions are legal in nature does not mean that they can necessarily be resolved on the pleadings alone. *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 42 (1st Cir. 2020) (holding that "the court below should not have made a choice-of-law determination at the motion-to-dismiss stage"). Wirtgen is, in essence, asking this court to resolve every potential choice-of-law issue that might arise in this case now, but the court has no basis for taking that kind of sweeping, preemptive action.[3] Hayden-Murphy cannot keep its choice-of-law options open forever. At some point, it will need to identify discrete, substantive differences between Minnesota law and Tennessee law, tied to identifiable contested issues raised by this case, which the court can either accept or reject as grounds for applying one state's laws over another's. For now, however, it is permissible for the two states' causes of action to be pleaded in the alternative.

---

[3] The court notes, moreover, that, while the court bases its conclusion on the ordinary Rule 12(c) standard, there is also little prudential reason to reach this issue now. It appears that Tennessee and Minnesota law are quite similar in this area. It is therefore not clear to the court that any substantial amount of time, effort, or resources would be preserved by eliminating Minnesota claims but permitting Tennessee claims to proceed, or vice versa.

19

**C. Right to Use Other Minnesota Retailers**

Wirtgen argues that the court should dismiss Counterclaims 5 and 7 because each claim assumes, incorrectly, that Wirtgen was barred by the parties' contract from relying on other dealers in Minnesota. Wirtgen argues that the relevant contractual language forbids Wirtgen itself from selling "directly" to "customers" in that area, but offers no assurances about selling to other retailers. (*See* Doc. No. 33-2 at 10.) The sales at issue involve "RDO Equipment Co., an existing . . . dealer in the State of Minnesota," which has "represented [its locations] to consumers as authorized Wirtgen locations for the sale, rental, and service of Wirtgen equipment and parts." (Doc. No. 16 ¶ 47.)

In Hayden-Murphy's Response, it concedes that "there is no dispute that Hayden-Murphy was authorized as a 'non-exclusive' dealer in Section 1.01" of the Distributor Sales and Service Agreement. (Doc. No. 49 at 10.) It argues, however, that "[w]hether RDO is a dealer . . . is a factual question." (*Id.*) That argument, however, directly contradicts Hayden-Murphy's pleading of its counterclaims, in which Hayden-Murphy explicitly refers to RDO as a "John Deere dealer" and describes RDO's Minnesota sites as "[d]ealership locations." (Doc. No. 39 ¶ 47.) Hayden-Murphy suggests that RDO is nevertheless not an "authorized" dealer of Wirtgen products in Minnesota (as opposed to several other states), but nothing in the Distributor Sales and Service Agreement suggests that that distinction is relevant. Rather, the distinction drawn by the agreement is between direct sales and non-direct sales.

It is clear, from Hayden-Murphy's pleading, that the Counterclaims at issue were, in fact, premised on the mistaken assumption that Hayden-Murphy was an exclusive Wirtgen dealer. Hayden-Murphy alleges, "[u]pon information and belief, in breach of its contractual restrictions on selling equipment and parts to parties in Hayden-Murphy's Area of Primary Responsibility,

20

Wirtgen has authorized and is selling Wirtgen equipment and parts to other dealers located in Hayden-Murphy's Areas of Primary Responsibility (i.e. the State of Minnesota)." (*Id.* ¶ 46.) All of Hayden-Murphy's allegations regarding RDO involve actions taken by RDO in its capacity as a dealer. (*Id.* ¶ 47.) Counterclaim 5 is expressly captioned as involving "Sales to Dealers in [Hayden-Murphy's] Area of Primary Responsibility," and Count VII states that it is about "a competing Wirtgen products dealer." (*Id.* at 25 & ¶ 130.) The idea that these claims are not about use of another dealer appears to be a *post hoc* invention of the briefing, not a fair characterization of the claims themselves.

Wirtgen's reading of the regional restriction as involving only direct sales is, moreover, convincing. The word "customer" might, in isolation, be ambiguous with regard to whether it referred to consumers only or all buyers. The sales restriction, however, explicitly refers to sales "*directly* to any customer," and the "directly" would make little sense unless the provision was discussing direct consumer sales. (Doc. No. 33-2 at 10.) The express description of Hayden-Murphy as a "non-exclusive" dealer makes that meaning even clearer. (*Id.* at 1.) The court will therefore grant Wirtgen judgment on the pleadings as to Counterclaims 5 and 7. *See Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 484 F.3d 865, 870 (6th Cir. 2007) (rejecting similar claim because the parties' contract permitted the use of other dealers). Because Counterclaim 6 relies on the same contentions (Doc. No. 39 ¶ 120), the court will recognize this argument as an alternative basis for granting judgment on the pleadings as to that claim, as well.

## IV. MOTION TO AMEND

### A. Legal Standard

Federal Rule of Civil Procedure 15(a)(2) provides that, if a party can no longer amend its pleading as a matter of course (under Rule 15(a)(1)), it "may amend its pleading only with the

21

opposing party's written consent or the court's leave." Rule 15(a)(2) specifically directs courts to "freely give leave [to amend] when justice so requires." The Sixth Circuit interprets this rule as embodying a "liberal amendment policy." *Brown v. Chapman*, 814 F.3d 436, 442 (6th Cir. 2016) (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)). Denial may nonetheless be appropriate when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

**B. Analysis**

In the currently operative Complaint, Wirtgen alleges that it has the right to terminate the parties' agreement based on the departure of Hayden-Murphy CEO Len Kirk without Wirtgen's consent. (Doc. No. 33 ¶ 28.) The proposed Third Amended Complaint still includes that allegation, but it also alleges a number of other changes in ownership and/or control of Hayden-Murphy that, Wirtgen argues, gave rise to a termination right because the changes were made without Wirtgen's consent. Wirtgen alleges five instances, from 2010 through 2022, in which Hayden-Murphy's ownership structure—which had originally reflected 90% ownership by Jeffrey Lupient, who is now deceased, and 10% ownership by Kirk—changed, primarily through the allocation of shares to trusts devoted to members of the wider Lupient family. (Doc. No. 55-1 ¶¶ 31–37.) Wirtgen also identifies eight changes in the membership of Hayden-Murphy's board, for which Hayden-Murphy allegedly failed to obtain consent. (*Id.* ¶¶ 40–47.)

Hayden-Murphy argues first that at least some of the proposed amendments would be futile because the events at issue occurred outside what Hayden-Murphy refers to as "the applicable statute of limitations"—that is, the ordinary statute of limitations for breach of contract claims. (Doc. No. 57 at 6.) This argument, however, fails on its face, because, as Wirtgen succinctly points out in its Reply, "Wirtgen has not sued Hayden-Murphy for breach of contract." (Doc. No. 59 at 2.) Rather, Wirtgen wishes to exercise a termination or non-renewal right *under* the contract. Hayden-Murphy has not identified any reason why Tennessee's statute of limitations would apply to the exercise of that right. Statutes of limitation "are aimed at lawsuits, not at the consideration of particular issues in lawsuits." *United States v. W. Pac. R. Co.*, 352 U.S. 59, 72 (1956). The possibility that some of these events might support breach of contract claims that would be time-barred does not mean that that time limitation follows the underlying facts wherever they go.

Hayden-Murphy argues next that the amendments regarding changes in ownership would be futile because the changes were not "substantial," as contemplated by the parties' agreement. Wirtgen disputes that the agreement should be interpreted to include a substantiality requirement in order for changes in ownership or control to give rise to a termination right, but, even if there is such a requirement, nothing in the proposed Third Amended Complaint permits the court to assume that the any of the newly alleged changes were insubstantial. Although Hayden-Murphy describes the changes in ownership as *de minimis*, many involved sizable chunks of the company. For example, in 2020, Barbara Lupient, who began the year owning 78% of Hayden-Murphy, transferred 13% of the company to Jeffrey Lupient, another 13% to a trust for Jennifer Lupient, and 19% to a trust for other members of the family. (Doc. No. 59-1 ¶¶ 35–36.) The court cannot assume that, simply because those transfers involved members of the same family (and trusts devoted to members of that family), the changes in ownership were insubstantial.

Hayden-Murphy argues next that the court should ignore the size of the ownership changes because the shares being exchanged were nonvoting. The parties' agreement, however, clearly refers to any "substantial change in the ownership *or* control" of Hayden-Murphy, which, on its face, establishes that either such type of change is independently sufficient. (Doc. No. 33-2 at 18 (emphasis added).) Nevertheless, Hayden-Murphy argues, confusingly, that "[t]he phrase 'ownership or control' . . . seems to suggest a relationship between the two." (Doc. No. 57 at 5.) That, though, is not what "or" means; if anything, it is close to the opposite of what "or" means. The plain meaning of the relevant language is that a substantial change in ownership alone, without consent, is sufficient to trigger termination rights, even in the absence of any change in control. There is, therefore, no ground for assuming that pleading the changes in ownership would be futile.[4]

Hayden-Murphy's only argument regarding changes in the membership of Hayden-Murphy's board of directors is that changes in board of directors membership are not "changes in control," as long as they are not accompanied by changes in majority ownership or the termination of corporate officers. It may well be that some corporate boards are, as a practical matter, more ornamental than functional. As a formal matter, however, directors are called "directors" because they have the power to direct the affairs of the company. That is why, for example, Minnesota statutes refer to "the directors or the persons having the authority otherwise vested in the board." Minn. Stat. Ann. § 302A.751(b). It is possible that Hayden-Murphy can establish that, in context, these board changes were insubstantial. Because the court cannot reach such a conclusion on the pleadings, however, amendment would not be futile.

---

[4] The court also notes that there is no merit to Hayden-Murphy's suggestion that the court should ignore these ownership changes, because they were "done only for estate planning purposes." (Doc. No. 57 at 7.) A change is a change, regardless of the subjective motivations involved.

The court sees no other reason why amendment would be inappropriate. The request for leave to amend was timely made, and, while the proposed amendments might expand the scope of the case somewhat, the facts alleged are still closely related to the issues already raised. Hayden-Murphy has not identified any major injustice that it would suffer from such amendments or any untenable discovery obligations that might arise. To the contrary, it appears that many of the facts at issue would likely be relevant and discoverable even in the absence of a formal amendment. The court will, therefore, grant Wirtgen leave to amend.

## V. CONCLUSION

For the foregoing reasons, Wirtgen's Motion for Judgment on the Pleadings on Certain Counterclaims, to Dismiss the Remaining Counterclaims as Unripe, and to Strike Hayden-Murphy's Affirmative Defense of Waiver (Doc. No. 47) will be granted in part and denied in part, and Wirtgen's a Motion for Leave to File Third Amended Complaint (Doc. No. 55) will be granted. The court will grant Wirtgen judgment on the pleadings as to Counterclaims 5, 6, and 7.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge