UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **WIRTGEN AMERICA, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:22-cv-00308** |
| | ) | **Judge Aleta A. Trauger** |
| **HAYDEN-MURPHY EQUIPMENT** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant/Counter Plaintiff.** | ) | |

## MEMORANDUM

Hayden-Murphy Equipment Company ("Hayden-Murphy") has filed a Motion for Summary Judgment (Doc. No. 76), to which Wirtgen America, Inc. ("Wirtgen") has filed a Response (Doc. No. 84), and Hayden-Murphy has filed a Reply (Doc. No. 86). Wirtgen has filed a Motion for Summary Judgment (Doc. No. 78), to which Hayden-Murphy has filed a Response (Doc. No. 81), and Wirtgen has filed a Reply (Doc. No. 88). For the reasons set out herein, Wirtgen's motion will be granted and Hayden-Murphy's motion will be denied.

## I. BACKGROUND

### A. State Restrictions on Terminating Heavy Equipment Retail Agreements

This case has significant connections to two states: Tennessee, where Wirtgen has its headquarters, and Minnesota, where Hayden-Murphy does business. Each of those two states has enacted a statutory framework intended to protect retailers of heavy equipment, like Hayden-Murphy, from certain potential actions by suppliers, like Wirtgen. *See* Tenn. Code Ann. §§ 47-25-1301 to -1314; Minn. Stat. Ann. §§ 325E.068 to .0684. For example, Tennessee law requires that "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to

renew or substantially change the competitive circumstances of a retail agreement without good cause," even if the parties' contract says otherwise. Tenn. Code Ann. §§ 47-25-1302(a).

The statute defines "good cause" to refer, first, to any "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." Tenn. Code Ann. § 47-25-1302(a). The statute then lists a series of additional events that qualify as "good cause" as a matter of law, including any instance in which "[t]he retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership." Tenn. Code Ann. § 47-25-1302(a)(6). Good cause, however, "does not exist if the supplier consents to" the qualifying change. *Id.*

The relevant Minnesota statutes—which, together, make up the Minnesota Heavy and Utility Equipment Manufacturers and Dealers Act, or "MHUEMDA"—impose largely the same restrictions. *See* Minn. Stat. Ann. § 325E.0683. However, the Minnesota statute expressly states that, in the face of a proposed change in ownership or control, the "equipment manufacturer . . . shall not withhold consent unreasonably." Minn. Stat. Ann. § 325E.0681(1). Tennessee's statute contains no such express reasonableness requirement applicable to consent in connection with a change in ownership or control.[1] *See* Tenn. Code Ann. § 47-25-1302(a)(6).

## B. Wirtgen and Hayden-Murphy's Agreement

Wirtgen is a supplier of road construction and surface mining equipment. Its products are sold under a number of brand names, depending on the category of machinery at issue—for

---

[1] In contrast, Tennessee's statute does have an express reasonableness requirement applicable to the withholding of approval of a new business location. *See* Tenn. Code Ann. § 47-25-1302(a)(2).

example, "Vögele" for asphalt-paving machinery and "Hamm" for compaction machinery. (Doc. No. 85 ¶ 2.) The end users of Wirtgen's goods typically buy or rent the equipment they need through Wirtgen's network of around 32 independent dealers. (Doc. No. 82 ¶¶ 1–2; Doc. No. 85 ¶¶ 3, 49.) Hayden-Murphy is one of those dealers, although it also sells the goods of at least eight other manufacturers. (Doc. No. 85 ¶¶ 4, 145.)

On January 1, 2010, Wirtgen and Hayden-Murphy entered into a Distributor Sales and Service Agreement, whereby Hayden-Murphy agreed to be a non-exclusive dealer of various lines of Wirtgen products in Minnesota. (Doc. No. 82 ¶¶ 3–4; Doc. No. 33-2.) Hayden-Murphy has conceded, for the purposes of summary judgment, that the agreement was "finally executed" at Wirtgen's offices in Antioch, Tennessee. (Doc. No. 82 ¶ 6.) The Distributor Sales and Service Agreement states that it is "renewable annually upon the consent of both parties." (Doc. No. 33-2 at 16.) Hayden-Murphy and Wirtgen have continued to do business with each other under the Agreement since its execution, but they have not engaged in any formal annual process of memorializing their mutual consent to renewal. (Doc. No. 85 ¶ 35.)

If the parties agree to terminate the Distributor Sales and Service Agreement, they may do so at any time. (Doc. No. 33-2 at 16.) Otherwise, a decision by one party to terminate the contract must comply with certain procedures. Under the terms of the contract as written, either Wirtgen or Hayden-Murphy "may terminate this Agreement at any time, with or without cause, upon sixty (60) days written notice to the other party." (*Id.*) The Agreement also grants Wirtgen accelerated termination rights in certain situations, including "any loss of managers, officers or key employees through termination of employment or otherwise, which in the commercially reasonable judgment of [Wirtgen] may adversely affect the business of [Hayden-Murphy] or [Wirtgen]" or "[a] substantial change in the ownership or control of [Hayden-Murphy] without prior written consent

3

of Wirtgen." (*Id.* at 18.) All of the aforementioned termination rights are, however, potentially subject to additional restriction by the applicable laws of a state that, like Tennessee, does not permit retailers and suppliers to contract out of its baseline statutory framework for such relationships. *See* Tenn. Code Ann. § 47-25-1312 ("Any contractual term restricting the procedural or substantive rights of a retailer under this part . . . is void.").

The Distributor Sales and Service Agreement includes a provision forbidding Hayden-Murphy from selling, assigning, delegating, or otherwise transferring any of its "rights or obligations" under the agreement. (*Id.* at 25–26.) Although this case does not involve assignment of Hayden-Murphy's rights in the ordinary sense, the Distributor Sales and Service Agreement defines "assignment" broadly to include some events that are relevant to this case:

> [Wirtgen] has entered into this Agreement in reliance upon the representations and personal abilities of the current owners and managers of [Hayden-Murphy]. The parties agree that the rights conferred on [Hayden-Murphy] by this Agreement are contingent upon the continuation of the present owners and managers of [Hayden-Murphy]. Any merger, consolidation, transfers of assets, event or transaction which results (whether by operation [of] law or otherwise) in a change of ownership or control of [Hayden-Murphy] or [Hayden-Murphy's] business shall be deemed an assignment by [Hayden-Murphy] for purposes of this Agreement.

(*Id.* at 26.)

The contract also includes a provision limiting the circumstances in which a party can be found to have waived a right under the agreement:

> The failure of either party to enforce at any time any provision of this Agreement shall not be construed as a waiver of that provision or of the right of that party to enforce the provision in the future. No departure from this Agreement shall permit any subsequent departure, and no waiver by either party of any term of this Agreement or of any breach thereof shall be deemed a waiver of such term or any subsequent similar breach.

(*Id.* at 25.) That provision, however, does not bar waiver by affirmative statement or a course of action other than nonenforcement alone. (*Id.*)

4

Finally, the contract includes the following choice-of-law provision, which also addresses the issue of how the contract should be construed if any of its provisions are found to be unlawful:

> This Agreement shall be construed, interpreted and enforced in accordance with the laws of the state of Tennessee. Any action between [Wirtgen] and [Hayden-Murphy] shall be filed either in the United States District Court for the Middle District of Tennessee or in the Chancery Court for Davidson County, Tennessee, and the parties hereby consent to the jurisdiction and venue of the foregoing courts. If the performance of any obligation or the exercise of any right pursuant to this Agreement would be unlawful, such performance or exercise shall be modified to the minimum extent necessary to comply with such law, without invalidating the remainder of this Agreement.

(*Id.* at 25.)

## C. Changes in Ownership and Directors of Hayden-Murphy

When Wirtgen and Hayden-Murphy first signed their agreement, Hayden-Murphy was 90% owned by James Lupient and 10% owned by Len Kirk, who also served as the company's CEO. (Doc. No. 82 ¶ 8.) Wirtgen maintains that it was aware of this ownership structure, at least in general terms, but Hayden-Murphy disputes that fact, pointing to the incomplete and arguably conflicting memories of those involved. (*Id.* ¶ 9.)

James Lupient died in 2011, resulting in his shares passing to his wife, Barbara Lupient, who had already become "heavily involved" in the company during her husband's preceding illness. (*Id.* ¶ 20; Doc. No. 85 ¶ 15.) James Lupient had also been a member of Hayden-Murphy's Board of Directors until the date of his death, but he was not immediately replaced. (Doc. No. 82 ¶ 55.)

In 2012, Barbara Lupient, as the controlling owner of Hayden-Murphy, directed the company to create a class of non-voting shares "for estate planning purposes." (Doc. No. 85 ¶ 113.) She transferred non-voting shares collectively equivalent to 20% of the company into two irrevocable trusts—one for her daughter, Jennifer Lupient, and one for her son, Jeffrey Lupient.

5

After those transfers, Hayden-Murphy was owned 70% by Barbara Lupient, 10% by the Jennifer Lupient Trust, 10% by the Jeffrey Lupient Trust, and 10% by Kirk. *(*Doc. No. 82 ¶¶ 21–22, 39, 44.) At all times relevant to this litigation, the trusts for Jeffrey and Jennifer Lupient were overseen by trustees who were not members of the Lupient family. (*Id.* ¶¶ 40–48.)

In 2013, Jeffrey Lupient and another individual, Dennis Quinn, were added to the Board of Directors. Two more Directors—James Sticha and Todd Taggart—were added in 2014. (*Id.* ¶ 55.) Hayden-Murphy has presented evidence that its Board of Directors is not, as a practical matter, a particularly active one and views its role as largely advisory, with Barbara Lupient left to make "ultimate decisions" for the company. (*See* Doc. No. 85 ¶¶ 127–30.)

In 2018, Hayden-Murphy redeemed the stock owned by Kirk for about $1.65 million. Following the redemption, Barbara Lupient owned 78% of the company, with her children's trusts owning, respectively, 11% each. (Doc. No. 82 ¶¶ 23–24.) That same year, another Board member, Ralph Strangis, died and was not immediately replaced. (*Id.* ¶ 55.)

In 2020, Barbara Lupient undertook several additional transfers of Hayden-Murphy shares. She sold shares equivalent to 13% of the company to Jeffrey Lupient, as an individual. (*Id.* ¶¶ 25–26.) She transferred an equal number of shares to the Jennifer Lupient Trust, and a larger number of shares into a third irrevocable trust—this one for her grandchildren. (*Id.* ¶¶ 27–28, 49.) Once this series of transactions was completed, Hayden-Murphy was owned 33% by Barbara Lupient, 24% by the Jennifer Lupient Trust, 19% by the Grandchildren's Trust, 13% by Jeffrey Lupient as an individual, and 11% by the Jeffrey Lupient Trust. (*Id.* ¶ 30.) Barbara Lupient, however, owned 100% of voting shares. (Doc. No. 85 ¶ 118.) The Grandchildren's Trust has been, at all times relevant to this litigation, overseen by a trustee, Dennis Quinn, and trust protector, Earl Stratton, who are not members of the Lupient family. (Doc. No. 82 ¶¶ 50–52.)

One member of the Board, Donald G. Pederson, ended his service near the end of 2020. A few months later, in March 2021, Jennifer Lupient joined the board, as did new CEO Don Knackstedt. A few months after that, Todd Taggart left the Board. (Doc. No. 82 ¶ 55.)

In July 2022, the Grandchildren's Trust transferred its shares to a fourth trust, the Barbara Lupient Revocable Trust, for which Barbara Lupient was both the beneficiary and trustee. A few months later, Barbara Lupient transferred her own shares into that trust as well. As a result, Hayden-Murphy was then owned 52% by the Barbara Lupient Revocable Trust, 24% by the Jennifer Lupient Trust, 13% by Jeffrey Lupient as an individual, and 11% by the Jeffrey Lupient Trust. (*Id.* ¶ 33; Doc. No. 85 ¶ 120.) At the end of 2022, Len Kirk left his position on the Board. (Doc. No. 82 ¶ 55.)

Wirtgen claims that, "[p]rior to April 2022, the month this lawsuit was filed, Hayden-Murphy never notified Wirtgen of any of the changes in the percentages of Hayden-Murphy stock owned by the various owners of Hayden-Murphy . . . ." (*Id.* ¶ 16.) Hayden-Murphy disputes that Wirtgen was, or plausibly could have been, wholly in the dark regarding at least some of the changes, particularly those necessitated by James Lupient's death, which, Wirtgen concedes, "may have been widely reported in Minneapolis." (Doc. No. 85 ¶ 34.) Ultimately, however, Hayden-Murphy identifies no notice that it provided to Wirtgen about the changes and concedes, for the purposes of summary judgment, that Wirtgen CEO Jim McEvoy was "under the impression" that the ownership of the company had remained unchanged since 2010. (Doc. No. 82 ¶ 19.) Hayden-Murphy also concedes, for the purposes of summary judgment, that it never informed Wirtgen of the changes to the Board of Directors. (*Id.* ¶ 56.)

**D. Events Giving Rise to Litigation**

In 2017, John Deere & Co. ("John Deere") acquired Wirtgen. (Doc. No. 85 ¶ 90.) Wirtgen concedes, for the purposes of summary judgment, that, "[a]fter the acquisition by John Deere, Wirtgen determined that it was in Wirtgen's interest to begin aligning its dealer network with John Deere's dealer network so more of Wirtgen's products and Deere's products are sold and serviced through the same network of dealers." (*Id.* ¶ 94.) Hayden-Murphy is not part of John Deere's dealer network. (*Id.* ¶ 96.) Wirtgen, however, did not take any immediate, affirmative steps to end the parties' relationship. (*Id.* ¶ 98.)

On August 13, 2018, Kirk—who was, at that point, still serving as Hayden-Murphy's CEO—sent Wirtgen a letter informing it that he intended to step down from that position at the end of the year. He explained that a succession plan was in place that would move then-CFO Don Knackstedt into the CEO position. Kirk stated that he would continue to serve on Hayden-Murphy's Board of Directors, at the Board's request. (Doc. No. 72-1 at 2.) The news of Kirk's retirement was not entirely surprising to Wirtgen, because Kirk had mentioned the possibility before. Nevertheless, Kirk was a key figure in the companies' ongoing relationship, and his impending departure would be a significant event. (Doc. No. 85 ¶¶ 54–55.)

Shortly after Kirk sent the letter, representatives for Wirtgen and Hayden-Murphy met to discuss the situation. The parties' characterizations of that meeting differ, but they agree that Wirtgen did not state, during the meeting, that it intended to deny consent to the succession plan. (*Id.* ¶ 56.) However, not long thereafter, on September 20, 2018, Wirtgen Vice President of Dealer Development Brodie Hutchins sent Kirk and Hayden-Murphy a letter, in which he wrote:

> We have taken some time since our meeting to consider what you said. Even though you will still be part of the customer relationships during the transition, we nevertheless have concerns regarding the succession. We are . . . unaware of any meaningful relationships between Don Knackstedt and our customer base.

8

> Because of these concerns, we are not presently able to consent to this substantial change in management and control. We will continue to monitor the situation between now and your actual retirement. We hope you understand.

(Doc. No. 18-3 at 2.) In the wake of the letter, Hayden-Murphy sent representatives to Nashville to meet with McEvoy and Hutchins. Wirtgen concedes, for the purposes of summary judgment, that, during the meeting, it "not indicate that [it] would discontinue the parties' Agreement." (Doc. No. 85 ¶¶ 59–61.) Kirk, as expected, departed his role as CEO at the end of the year. (*Id.* ¶ 67.)

Despite the concerns that Wirtgen raised in 2018, the parties' relationship remained intact for the ensuing few years, without Wirtgen's ever taking any overt steps to terminate or refuse to renew the Distributor Sales and Service Agreement. Wirtgen concedes, for the purposes of summary judgment, that it "does not believe there was a deficiency in operational performance of Hayden-Murphy during the over four-year period Don Knackstedt acted as CEO and President." (*Id.* ¶ 74.) Wirtgen also concedes, for the purposes of summary judgment, that it "encouraged Hayden-Murphy to engage more customers outside of the metro Minneapolis area" during that period and "was aware that Hayden-Murphy took steps to open a second dealership location" in another Minnesota city. (*Id.* ¶¶ 79–80.) That second location, like Hayden-Murphy's business as a whole, sells both Wirtgen products and the products of other manufacturers. (*Id.* ¶ 80.)

On April 8, 2022, McEvoy sent Knackstedt a letter informing him that "Wirtgen strongly believe[d] that the time ha[d] come to allow each of [the two] companies to pursue its business objectives separately." (Doc. No. 33-4 at 4.) The letter explained Wirtgen's position, at the time, as follows:

> Section 5.01 of the Agreement says that it became effective on January 1, 2010 and will automatically expire at the end of each calendar year unless both Hayden-Murphy and Wirtgen consent to renew it. After the Agreement went into effect, it remained in Wirtgen's interest to consent to the renewal of the Agreement. With John Deere & Co.'s acquisition of Wirtgen, however, that is no longer the case. We

9

now believe it is in Wirtgen's interest to begin aligning its dealer network with Deere's dealer network, so more of Wirtgen's project lines and Deere's product lines are sold and serviced through the same network of dealers. We're not saying that Hayden-Murphy was in any way responsible for the misalignment that now exists in Wirtgen's and Deere's dealer networks, nor are we encouraging Hayden-Murphy to become a Deere dealer. We are saying that the Agreement, with its automatic, annual expiration provision absent mutual consent, is designed to accommodate situations like this where it is no longer in one party's business interest to remain in business together. And[] we intend to exercise our right to allow the Agreement to expire at the end of the year, depending upon your response to this letter.

(*Id.* at 2.) However, McEvoy also asserted that, in addition to that alleged annual right of nonrenewal, Wirtgen believed that it was entitled to terminate the contract based on the 2018 departure of Kirk, to which, Wirtgen maintained, it had never consented. (*Id.* at 3.) Wirtgen concedes, for the purposes of summary judgment, that it already knew the identity of the retailer it intended to bring on as, effectively, Hayden-Murphy's replacement in the Minneapolis area: RDO Equipment Company, which, unlike Hayden-Murphy, was an authorized John Deere dealer. (Doc. No. 85 ¶ 99.)

In response, Knackstedt stated by letter that, in Hayden-Murphy's view, "Wirtgen cannot simply non-renew the Agreement, and[,] instead, there must be 'good cause' to terminate . . . ." (Doc. No. 18-5 at 2.)  Hayden-Murphy disputed that Len Kirk's departure four years earlier provided a continuing basis for termination and expressed a desire to continue on as a Wirtgen dealer. (*Id.* at 2–3.)

**D. This Case**

On April 28, 2022, Wirtgen filed a Complaint for Declaratory Judgment against Hayden-Murphy. (Doc. No. 1.) That Complaint has been superseded repeatedly, and the currently operative Complaint is the Fourth Amended Complaint, filed on September 26, 2023. (Doc. No. 66.) Wirtgen asks the court to declare that:

(a) Wirtgen has the right to allow the Agreement to expire at the end of the calendar year by not consenting to its renewal and (b) Wirtgen has the right to terminate the Agreement as of the end of the calendar year as a result of (i) a substantial change in the control of Hayden-Murphy without Wirtgen's consent, (ii) a change in the managers of Hayden-Murphy without Wirtgen's advance approval, (iii) a loss of managers, officers, or key employees which, in Wirtgen's commercially reasonable judgment, may adversely affect the business of Hayden-Murphy or Wirtgen, and/or (iv) one or more unlawful assignments.

(Doc. No. 66 at 14.)

On July 29, 2022, Hayden-Murphy filed a Motion to Dismiss (Doc. No. 24), which the court denied. (Doc. No. 31.) In so doing, the court reached at least two legal conclusions that remain relevant to this case, holding that:

- Hayden-Murphy, which had argued that the court should apply Minnesota law, had failed to establish a sufficient basis for disregarding the parties' contractual choice-of-law provision, but the possibility that it could make such a showing remained open. (*Id.* at 16.)

- Tennessee's equipment retail statute imposes a good cause requirement on Wirtgen's power to refuse to renew its relationship with Hayden-Murphy at the end of each calendar year. (*Id.* at 21.)

Regarding the overall request to dismiss, the court concluded that Wirtgen had plausibly asserted that it had a right to end the parties' relationship for good cause, which was sufficient to permit the case to proceed. (*Id.* at 24.) As a legal matter, however, the second of the above rulings precluded any later award of Wirtgen's first requested declaration under Tennessee law, because that declaration assumed an absolute right of nonrenewal at the end of the calendar year. (*See* Doc. No. 66 at 14.)

On February 17, 2023, Hayden-Murphy filed its Answer, Affirmative Defenses, and Counterclaims. (Doc. No. 39.) Reflecting the parties' disagreement regarding choice of law, some of the eight counterclaims rely on Tennessee law, while some rely on the law of Minnesota.

11

Counterclaim 1 is based on Wirtgen's threatened violation of the good cause requirement for termination under MHUEMDA, Minn. Stat. Ann. § 325E.0681(1). (*Id.* ¶¶ 70–80.) Counterclaim 2 states a similar claim under Tenn. Code Ann. § 47-25-1302(a). (*Id.* ¶¶ 81–90.) Counterclaim 3 is another MHUEMDA claim, this time based on Wirtgen's having "attempt[ed] or threaten[ed] to terminate, cancel, [or] fail to renew . . . the dealership agreement . . . based on . . . circumstance[s] beyond the dealer's control," Minn. Stat. Ann. § 325E.0682(b)(4). (*Id.* ¶¶ 91–97.) Counterclaim 4 states the same general theory of liability pursuant to the corresponding Tennessee statute regarding circumstances beyond a retailer's control, Tenn. Code Ann. § 47-25-1304(4). (*Id.* ¶¶ 98–104.) Counterclaim 5—which, as the court will explain later in this section, no longer remains pending—was for breach of contract, based on the allegation that "Wirtgen has authorized and is selling equipment and parts to dealers located in Hayden-Murphy's Areas of Primary Responsibility (i.e. the entire State of Minnesota) in breach of the parties' Agreement." (*Id.* ¶¶ 105–15.) Counterclaim 6 was a third MHUEMDA claim, based on Wirtgen's "substantially chang[ing] the competitive circumstances of" Hayden-Murphy, Minn. Stat. Ann. § 325E.0681, by working with other dealers in Hayden-Murphy's territory. (*Id.* ¶¶ 116–25.) Counterclaim 7 restated that theory of liability pursuant to Tennessee law. (*Id.* ¶¶ 126–35.) Counterclaim 8 was for violation of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 136–50.)

On March 23, 2023, Wirtgen filed an Answer to the Counterclaims (Doc. No. 46), as well as a Motion for Judgment on the Pleadings on Certain Counterclaims, to Dismiss the Remaining Counterclaims as Unripe, and to Strike Hayden-Murphy's Affirmative Defense of Waiver (Doc. No. 47). While that motion was pending, Wirtgen filed a Motion for Leave to File Third Amended Complaint, in order to assert the not-consented-to changes in Hayden-Murphy's ownership and Board, which Wirtgen had learned of through this litigation. (Doc. No. 55.)

12

While those motions were pending, in June 2023, Wirtgen sent a letter to Hayden-Murphy regarding the various changes in ownership and the Board of Directors that had either occurred recently or were discovered in litigation. (Doc. No. 66 at 65–67.) Wirtgen asserted that Hayden-Murphy was, in Wirtgen's view, in breach of the parties' contract, and Wirtgen asked Hayden-Murphy to inform Wirtgen if it intended to cure the breach. Hayden-Murphy responded with a letter acknowledging the situation but denying the breach, and it did not take any steps to cure. (*Id.* at 69–70.) Around the same time, Knackstedt was replaced as CEO by Jeff Clarke, without the formal consent of Wirtgen. (Doc. No. 87 ¶ 2.)

On September 11, 2023, the court issued a Memorandum and Order that, among other things, granted Wirtgen judgment on the pleadings in part, denied it judgment on the pleadings in part, and granted Wirtgen leave to file a Third Amended Complaint. (Doc. Nos. 60–61.) In so doing, the court addressed a number of legal issues that remain relevant to the case. Specifically, the court held that:

- The anti-waiver provision of the Distributor Sales and Service Agreement precludes Hayden-Murphy from arguing that Wirtgen waived any termination right by inaction alone, but it does not rule out the possibility that Wirtgen may have waived such rights by its affirmative conduct. (Doc. No. 60 at 11.)

- Hayden-Murphy had not yet identified any meaningful, applicable difference between Tennessee and Minnesota law that would call on the court to disregard the choice-of-law clause, but, "if . . . the states' approaches do diverge in a way that renders Tennessee law less protective of a retailer that would otherwise be entitled to the protection of Minnesota law, then there is a plausible argument that Tennessee choice-of-law principles would recognize Minnesota's superior interest." (*Id.* at 18.)

13

- Wirtgen was entitled to judgment on the pleadings with regard to Counterclaims 5, 6, and 7, which hinged on the incorrect assumption that the Distributor Sales and Service Agreement forbade Wirtgen from using other Minnesota dealers. (*Id.* at 21.)

- The fact that the Tennessee equipment retailer statute recognizes a termination right in the event of a sufficient change in "ownership *or* control" of Hayden-Murphy meant that the right could arise in connection with a substantial change in ownership, even if the change did not result in any change in the control of the company. (*Id.* at 24.)

- A change in the membership of the Board of Directors may—but does not necessarily—rise to the level of a substantial change in control. (*Id.*)

Wirtgen ultimately amended its Complaint one more time, unopposed, to assert additional events that occurred following the commencement of litigation.[2] (Doc. Nos. 64–66.) In Hayden-Murphy's Answer, it renumbered its counterclaims to redesignate what had been Counterclaim 8, for breach of the duty of good faith and fair dealing, as Counterclaim 5, reflecting the court's judgment on the pleadings with regard to the original Counterclaims 5 through 7. (Doc. No. 67 ¶¶ 104–19.) Each party now seeks summary judgment (Doc. Nos. 76, 78.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing,

---

[2] Technically, these new assertions of fact should have been filed as a supplemental complaint, rather than as an amendment to the original complaint. *See* Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.). The court, however, finds no prejudice in connection with this error.

14

the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of his claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

#### A. Choice of Law

When a federal court hears a diversity action, "the law[s] of the forum state, including the choice-of-law rules, apply." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). This court therefore must apply Tennessee's rule that a contract is typically "presumed to be governed by the law of the jurisdiction in which it was executed," but that the parties can overcome that presumption by manifesting "a contrary intent." *Vantage Tech., LLC v. Cross*, 17 S.W. 3d 637, 650 (Tenn. Ct. App. 1999) (citing

15

*Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). The clearest and simplest way to manifest such an intent is by including an express choice-of-law provision in the relevant contract, *id.*, as Wirtgen and Hayden-Murphy did here. In this instance, that provision calls for applying the law of the same state where the contract was executed—Tennessee.

Tennessee's policy of honoring choice-of-law provisions, however, is not ironclad. To be enforceable, "[t]he choice of law provision must be executed in good faith, the chosen jurisdiction must bear a material connection to the transaction, the basis for the jurisdiction must be reasonable and not a sham, and, finally, the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Sw. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 n.8 (6th Cir. 2006) (citations omitted). As the court has already held, there is no plausible argument that the Tennessee choice-of-law provision would fail any of the first three of those requirements, leaving the questions of (1) whether applying Tennessee law would be contrary to a "fundamental" public policy of Minnesota, (2) whether Minnesota law would "otherwise govern" the contract, and, (3) if so, whether Minnesota has a greater interest in the parties' relationship than Tennessee.

The Tennessee Court of Appeals, applying North Carolina's similar choice-of-law rules, has stated that, for a law to be contrary to the public policy of a state, it "must violate some prevalent conception of good morals or fundamental principle of natural justice or involve injustice to the people of the forum state." *Williams v. Smith*, 465 S.W.3d 150, 157 (Tenn. Ct. App. 2014) (quoting *Boudreau v. Baughman*, 322 N.C. 331, 340, 368 S.E.2d 849, 857 (1988)). Pursuant to that standard, there is reason to think that, *if* there are significant differences between MHUEMDA and Tennessee's statutes that bear on a particular situation, those differences might rise to the level of implicating a fundamental policy of Minnesota. As the court has previously noted,

16

MHUEMDA's apparent concern for the unequal bargaining power between manufacturers and retailers weighs in favor of a finding that the statute, broadly speaking, implicates issues of justice that could give rise to a fundamental policy difference. *See Astleford Equip. Co. v. Navistar Int'l Transp. Corp.*, 632 N.W.2d 182, 191 (Minn. 2001) ("[T]he purpose of [the statute] is to protect the dealer, who is often in a weaker bargaining position . . . ."); *see* Restatement (Second) of Conflict of Laws § 187 (stating that a policy is more likely to be found to be fundamental if it is "designed to protect a person against the oppressive use of superior bargaining power").

As the court observed in its Memorandum of September 11, 2023, however, that showing, in and of itself, is not sufficient to overcome the choice-of-law clause, because, among other things, a choice-of-law clause can only be invalidated, under Tennessee choice-of-law principles, if the law of the chosen state is actually contrary to the fundamental policy of the state with an arguably superior interest. At that point, Hayden-Murphy had had two opportunities to make such a showing and still had not done so. At Hayden-Murphy's urging, the court permitted the issue to remain unresolved pursuant to the principle that "the optimal timing for a choice-of-law determination is case-specific." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 42 (1st Cir. 2020). But the court warned Hayden-Murphy that it could not "keep its choice-of-law options open forever," and it would eventually need "to identify discrete, substantive differences between Minnesota law and Tennessee law, tied to identifiable contested issues raised by this case, which the court can either accept or reject as grounds for applying one state's laws over another's." (Doc. No. 60 at 19.)

The time for making such a showing has now come, and Hayden-Murphy has not done so—and has, in fact, made no effort to do so, briefing its motion largely, if not entirely, under Tennessee law. It may well be that no such showing could be made, given that Tennessee's law and Minnesota's law are so similar in this area. It may be that Hayden-Murphy has elected to drop

17

this argument because it found that Tennessee law was potentially more favorable to it on a key point—for example, with regard to whether the departure of a manager can amount to good cause for termination or nonrenewal.[3] Ultimately, Hayden-Murphy's motivation is immaterial. Because Hayden-Murphy, as the party (previously) seeking to have the court disregard the choice-of-law provision, has failed to make the necessary showing—and has, in fact, effectively abandoned this aspect of its arguments—Tennessee law applies. The court, therefore, will award Wirtgen summary judgment as to Counterclaims 1 and 3, without prejudice to Hayden-Murphy's assertion of similar claims under Counterclaims 2 and 4.

## C. Wirtgen's Declaratory Judgment Claim

The elimination of Hayden-Murphy's Minnesota claims leaves four claims before the court. The first of those claims is Wirtgen's claim for declaratory judgment. As a preliminary matter, the court notes that the exercise of the court's power to consider a claim for declaratory judgment is discretionary, and a request to exercise that discretion typically calls on the court to consider five factors:

> 1) whether the judgment would settle the controversy; 2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; 3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" 4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy that is better or more effective.

*Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 577 (6th Cir. 2019) (quoting *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 526 (6th Cir. 2001)). The court finds, based on those factors, that considering Wirtgen's claim is appropriate. An action for declaratory judgment would settle the controversy; it would usefully clarify the underlying

---

[3] Indeed, the court noted this possibility in its Memorandum of January 6, 2023. (Doc. No. 31 at 11.)

18

legal relationships; it does not reflect improper gamesmanship by Wirtgen; it would not increase friction with the state courts; and it provides Wirtgen with the best remedy, given that Wirtgen has not yet actually ended the parties' relationship.[4]

As the court has already noted, prior rulings in this case preclude Wirtgen's success on one aspect of the declaratory judgment claim: the request for a declaration that Wirtgen has an annual right to choose not to renew the Distributor Sales and Service Agreement without cause. Although the contract itself granted Wirtgen such a right, that approach is inconsistent with Tennessee statutes, which control over the conflicting contractual terms. What remains, then, is Wirtgen's request for a declaration that it "has the right to terminate the Agreement as of the end of the calendar year as a result of (i) a substantial change in the control of Hayden-Murphy without Wirtgen's consent, (ii) a change in the managers of Hayden-Murphy without Wirtgen's advance approval, (iii) a loss of managers, officers, or key employees which, in Wirtgen's commercially reasonable judgment, may adversely affect the business of Hayden-Murphy or Wirtgen, and/or (iv) one or more unlawful assignments." (Doc. No. 66 at 12–13.)

Wirtgen's cause of action, as pleaded, does not ask the court to parse all of the past dealings between the parties and provide an itemized list of every time a termination right arose or was waived. Rather, Wirtgen is seeking a determination of whether it currently has a right to terminate. Wirtgen's briefing, moreover, confirms, that, if the court concludes that such a right exists under any of Wirtgen's proposed rationales, there will be "no need" to analyze "any of the other grounds." (Doc. No. 84 at 9–10.) Accordingly, while the parties have understandably devoted a great deal of briefing to the question of whether Len Kirk's departure as CEO amounted to good cause and, if so, whether Wirtgen improperly delayed its reliance on that good cause, Wirtgen's

---

[4] In the alternative, the court holds that, if the court declined to resolve the declaratory judgment claim, much of its analysis would bear equally on Hayden-Murphy's statutory counterclaims.

declaratory judgment claim would only require the court to answer that question if the court concluded, first, that none of the other intervening events that Wirtgen has identified as giving it good cause is, in fact, sufficient to do so. In particular, Hayden-Murphy's numerous changes in ownership—for which it undisputedly did not receive affirmative consent—are, Wirtgen has argued, independently sufficient to support Wirtgen's decision. Those events, moreover, do not raise the same thorny issues of waiver, acquiescence, and delay that Kirk's departure as CEO does, because Wirtgen made no attempt to keep its termination rights based on those events alive by equivocating regarding its intentions. Indeed, it did not know, until this litigation was ongoing, that those rights even existed, at least for the most part.

Tennessee's equipment retailer statute permits a supplier to end the parties' relationship for good cause, which, as a matter of law, "exists whenever . . . [t]he retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership." Tenn. Code Ann. § 47-25-1302(a)(6). That condition has, on its face, been met numerous times. Indeed, there is not a single share of Hayden-Murphy that has not changed hands during the relevant period. Hayden-Murphy, however, did not receive consent for any of the underlying transactions.[5]

Hayden-Murphy protests that most of the changes in ownership that occurred were simply "estate planning" moves with no practical effect for any purpose relevant to its dealings with

---

[5] The court notes that Tennessee has adopted certain specific procedures to be followed "[i]n the event of the death of the retailer or the majority stockholder of a corporation operating as a retailer," Tenn. Code Ann. § 47-25-1309, and those procedures might arguably limit Wirtgen's rights in connection with the passing of James Lupient's shares to his wife upon his death. The court, however, finds that the other, subsequent changes in ownership—which, even setting aside the initial transfer by inheritance, affect 100% of the company's shares—are sufficient to support the court's analysis.

Wirtgen, because Barbara Lupient retained voting control for the entire time after James Lupient's death. This court, however, has already rejected the argument that a change in ownership must also result in a change in control in order to trigger the application of Tenn. Code Ann. § 47-25-1302(a)(6). The language of the statute, moreover, unambiguously confirms that good cause can arise from changes in the composition and proportion of ownership interests in the company, even if they affect only some of the company's shares. Good cause arises, for example, when the retailer transfers "an interest" in its ownership to another party or when there is a "substantial reduction" in the interest of a "major shareholder."

As the court has already held, moreover, there is no basis in the dealership statute for finding an exception based on the subjective estate planning-related motivations behind a transfer. (Doc. No. 60 at 24 n.4.) Indeed, Tennessee's equipment retailer statute specifically acknowledges that family members or heirs are not, for the statute's purposes, interchangeable. *See* Tenn. Code Ann. § 47-25-1309(b) ("This section does not entitle an heir, personal representative or family member to operate a dealership without the specific written consent of the supplier."). Nor can Hayden-Murphy plausibly argue that Wirtgen's assertion of rights based on the changes in ownership is barred by laches, because it was Hayden-Murphy who had an obligation to obtain consent and, therefore, Hayden-Murphy's fault that this issue was not raised sooner. *See, e.g.*, *Cincinnati Ins. Co. v. Malone*, No. M2015-02362-COA-R3-CV, 2016 WL 5888934, at *2 (Tenn. Ct. App. Oct. 7, 2016) (noting that, for a delay to give rise to laches, it must be "caused by" the party against whom laches is being asserted).

The lack of a general estate planning exception does not, of course, preclude the possibility that the details of a particular estate planning strategy might render a particular transfer insubstantial for the purposes of the statute. One might argue, for example, that Barbara Lupient's

21

transfer of her final cache of shares to her own revocable trust—of which she was the trustee—did not amount to good cause because it did not result in any meaningful change in the effective distribution of ownership interests. Even if the court were persuaded by such an argument, however, the direct transfer of shares from Barbara Lupient to her revocable trust was only one transfer of many that occurred over the relevant time period, and it involved only 33% of the company. Every other estate planning-related transfer involved either a private individual or an irrevocable trust with a trustee and beneficiary other than the original transferor. Even if one wholly disregards the eventual transfer of shares from Barbara Lupient into her own controlled and revocable trust, a full 67% of the company changed hands during the relevant period.

While the shares involved were non-voting, that does not mean that the transfers were meaningless and can simply be disregarded; doing so would be flatly inconsistent with the Tennessee General Assembly's decision to recognize good cause based on substantial changes in ownership *or* control. Whether or not control of the company changed hands, the transfers that the owners of Hayden-Murphy voluntarily undertook, without consultation with or consent by Wirtgen, were real, major changes to the identities of the individuals with concrete stakes in the company. If the Tennessee General Assembly had wished to limit a supplier's right to end its relationship with a retailer to changes in control or changes in ownership of voting shares, it easily could have done so. It, however, did not.[6]

Hayden-Murphy argues, next, that, even if Wirtgen could, in theory, assert good cause based on the changes in ownership, it has no right to do so here, because those changes in ownership are not, in fact, Wirtgen's actual motivation for wishing to end the parties' relationship. As Hayden-Murphy points out, some courts, applying similar statutes from other states, have

---

[6] The 2018 redemption of shares from Kirk, moreover, did not involve estate planning or non-voting shares.

22

rejected suppliers' attempts to rely on alleged good cause that did not actually reflect the supplier's motivations for terminating the underlying contract. *See, e.g.*, *Roadbuilders Mach. Supply Co. v. Sandvik Mining & Constr. USA, LLC*, No. 2:22-CV-02331-HLT, 2024 WL 1116079, at *11 (D. Kan. Mar. 14, 2024); *S & H Farm Supply, Inc. v. Bad Boy, Inc.*, No. 18-03413-CV-S-BP, 2020 WL 8372961, at *4 (W.D. Mo. Aug. 19, 2020); *Reliable Tractor, Inc. v. John Deere Const. & Forestry Co.*, 641 F. Supp. 2d 1325, 1335 (M.D. Ga. 2009). Those cases, however, involved attempts to assert new grounds for terminating contracts after an allegedly wrongful termination had already occurred. *See Roadbuilders Mach.*, 2024 WL 1116079, at *4, 11; *S&H Farm Supply*, 2020 WL 8372961, at *2; *Reliable Tractor*, 641 F. Supp. at 1328. Here, in contrast, Wirtgen has continued its relationship with Hayden-Murphy and is seeking only a declaration regarding its right to end that relationship in the future. Moreover, once it learned of the changes in ownership, it followed ordinary procedures for providing notice and an opportunity to cure in connection with the specific ground at issue. This case, therefore, does not raise the same dangers of *post hoc* rationalization that those cases presented.

In any event, Hayden-Murphy's argument is incompatible with the text of Tennessee's equipment retailer statute. The Tennessee General Assembly theoretically could have drafted that statute to forbid the ending of any supplier/retailer relationship for any reason other than an enumerated good cause. That, though, is not what the General Assembly did. Rather, the General Assembly made it unlawful to end the relationship "*without* good cause." Tenn. Code Ann. § 47-25-1302(a) (emphasis added). Nothing about the statute forbids a supplier who has good cause from weighing other considerations in deciding whether to exercise a termination or nonrenewal right. To endorse such a reading would go beyond simply imposing a good cause requirement and would, in effect, amount to requiring a supplier to act with a total disregard for its own legitimate

business objectives in making a decision that is expressly its decision to make. *Cf. HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp. LLC*, 994 F. Supp. 2d 520, 537 (S.D.N.Y. 2014) ("As long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract.") (collecting cases); *Hartford Elec. Supply Co. v. Allen-Bradley Co.*, 736 A.2d 824, 839 (Conn. 1999) ("[A] trial court . . . must apply an objective standard when determining whether the defendant had good cause to terminate an agreement.") (collecting cases).

The conclusion that Wirtgen's intent to align its network with its parent company's was not an improper consideration is further bolstered by the fact that there are some considerations that the statute expressly forbids, and that is not one of them. Specifically, a supplier may not "[t]erminate, cancel or fail to renew or substantially change the competitive circumstances of the retail agreement based on the results of a natural disaster, including a sustained drought or high unemployment in the dealership market area, labor dispute or other similar circumstances beyond the retailer's control." Tenn. Code Ann. § 47-25-1304(4). While Wirtgen's choice of business strategy is, in fact, beyond Hayden-Murphy's control, it is not, by any reasonable analysis, a "similar circumstance" to a natural disaster, a labor dispute, or a regional unemployment crisis. There is, therefore, no plausible reading of the statute that would forbid Wirtgen from considering its stated objectives. *Cf. River Valley Truck Ctr., Inc. v. Interstate Companies, Inc.*, 704 N.W.2d 154, 161 (Minn. 2005) (narrowly construing similar provision of MHUEMDA).

Hayden-Murphy argues next that the equipment retailer statute's discussion of changes in ownership is not intended to apply to transfers of stakes in a business entity at all—but, rather, to sales of dealership assets, particularly premises and franchise rights. Pursuant to this reading, any

24

Hayden-Murphy shareholder could transfer any quantity of voting or non-voting shares to anyone else, without giving rise to good cause, because Hayden-Murphy is not "the dealership," but rather the dealership's owner. Good cause would only arise if the physical dealership operation or the contractual right to operate as a Wirtgen dealer were sold. However, that interpretation is difficult to reconcile with the ordinary usage of the language in the statute, which, with its references to "shareholders," uses language suggestive of business entity ownership. The basic structure of the statute as a whole, moreover, is primarily about governing the relationships between a supplier and a retailer, not about some secondary unit, undefined in the statute, known as a "dealership." *See, e.g.*, Tenn. Code Ann. § 47-25-1301(4), (6). The court, therefore, finds this alternative reading of the statute implausible and will treat changes in ownership of Hayden-Murphy, as a business entity, as changes capable of giving rise to good cause under the statute.

Finally, Hayden-Murphy argues that, insofar as the Distributor Sales and Service Agreement does require consent for changes in ownership involving the Lupient family, that provision is not a lawful ground for termination because some other Wirtgen retailers have obtained provisions in their contracts permitting intrafamily transfers of interests without consent. (*See* Doc. No. 85 ¶¶ 149–50.) Ordinarily, a party that does business with multiple counterparties is free to include a provision in one contract and not another, but Hayden-Murphy argues that the Tennessee equipment retailer statute forbids a supplier from ending a retail relationship based on the violation of a contractual provision, if any other retailer in the relevant state enjoys a more favorable provision.

Hayden-Murphy's argument, however, confuses two different parts of the relevant statute. The requirement that Hayden-Murphy seeks to enforce does exist—but only for termination based

on a breach of contract that is not otherwise recognized as good cause by the statute itself. The statute clearly explains, however, that substantial changes in ownership are good cause *per se*:

> No supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a retail agreement without good cause. "Good cause" means failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state. *In addition,* good cause exists *whenever* . . . [t]he retailer transfers an interest in the dealership, or a person with a substantial interest in the ownership or control of the dealership, including an individual proprietor, partner or major shareholder, withdraws from the dealership or dies, or a substantial reduction occurs in the interest of a partner or major shareholder in the dealership. However, good cause does not exist if the supplier consents to an action described in this subsection (a).

Tenn. Code Ann. § 47-25-1302(a) (emphasis added). By the plain language of the statute, the ground for termination on which Wirtgen relies is "in addition" to—that is, distinct from—a supplier's right to terminate based on breach alone, only the latter of which is subject to the cited restriction. Insofar as there is any remaining ambiguity, moreover, the statute confirms that good cause exists "whenever" a qualifying transfer/reduction in interest occurs without consent. Hayden-Murphy, moreover, concedes that "[t]here is no caselaw directly construing" the relevant provisions. (Doc. No. 76 at 14.) There is, therefore, no basis for departing from the plain language of the statute, which is directly contrary to Hayden-Murphy's reading.

The court, therefore, finds that Wirtgen has established that it is entitled to summary judgment with regard to a declaration of its future right to end the parties' relationship. Although the Fourth Amended Complaint focuses on the right to terminate at the end of the year, nothing about the court's analysis would be limited to that form of termination, so the court will not limit its declaration in that way.

26

**D. Hayden-Murphy's Statutory Claims**

Tennessee's statute contemplates two potential causes of action by a retailer: (1) an "action for civil damages . . . against any supplier found violating" the statute, Tenn. Code Ann. § 47-25-1311(a); and (2) an action for "injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change," Tenn. Code Ann. § 47-25-1311(b). The court's holding that Wirtgen is, as a matter of law, entitled to end the parties' relationship precludes any judgment in Hayden-Murphy's favor with regard to the second type of claim. It is theoretically possible that a supplier could have the right to terminate or non-renew a relationship with a retailer, but still be liable to the retailer for damages based on some past violation. Hayden-Murphy, however, provides no argument in favor of such liability in this instance. The court, therefore, will grant Wirtgen summary judgment as to Counterclaims 2 and 4.

**E. The Covenant of Good Faith and Fair Dealing**

Finally, Hayden-Murphy asserts, through Counterclaim 5, that, even if Wirtgen would technically have the right to terminate or refuse to renew the parties' relationship under the express terms of the parties' contract and the applicable statutes, Wirtgen has acted in bad faith in connection with its assertion of that right. It is well-settled in Tennessee that "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *Covington v. Robinson*, 723 S.W.2d 643, 645–46 (Tenn. Ct. App. 1986)). The Tennessee Supreme Court has suggested that one way to look at this duty is by "allowing the qualifying word 'reasonable' and its equivalent 'reasonably' to be read into every contract." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (citing *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003); *Hathaway v. Hathaway*, 98 S.W.3d 675, 678–79 (Tenn. Ct. App. 2002); *Hurley v. Tenn.*

27

*Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995)). Hayden-Murphy asserts that Wirtgen's actions have contravened that obligation.

The duty imposed by the implied covenant of good faith and fair dealing is famously narrow, and courts routinely warn parties that the doctrine should not be thought of as "an independent basis for relief," separable from the contract into which the implied covenant has been read. *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 829 (M.D. Tenn. 2014) (quoting *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003)); *accord LeBlanc v. Bank of Am., N.A.*, No. 2:13-CV-02001-JPM, 2013 WL 3146829, at *14 (W.D. Tenn. June 18, 2013); *Upperline Equip. Co. v. J & M, Inc.*, 724 F. Supp. 2d 883, 892 (E.D. Tenn. 2009). That said, it is a mistake to assume, as many litigants do and Wirtgen's briefing arguably has, that, simply because the implied covenant of good faith and fair dealing is not an *independent* duty, it is not a *distinct* one. If the implied covenant of good faith and fair dealing added nothing to a contract, it would mean that there is really no such thing as a meaningful doctrine of the implied covenant of good faith and fair dealing at all—contradicting well-settled Tennessee caselaw. What the implied covenant of good faith and fair dealing provides is a distinct rationale for recovering under a contract based not on the literal violation of a contractual term but on a party's failure to perform its contractual obligations reasonably and in good faith. *See* Williston on Contracts § 38:12 (4th ed.).

The duty of good faith and fair dealing is, moreover, "particularly important where . . . one party possesses a unilateral right to impose serious costs on or otherwise adversely affect the other party to the contract." *Coleman v. Wells Fargo Banks, N.A.*, 218 F. Supp. 3d 597, 607 (M.D. Tenn. 2016) (Crenshaw, C.J.) (collecting cases). For example, the Sixth Circuit has recognized that, where an arbitration agreement grants one party a unilateral power to amend certain procedures, the "duty of good faith and fair dealing prohibits it from amending the [p]rocedure[s] for an

28

improper or oppressive purpose." *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 479 (6th Cir. 2005) (citing *Elliott v. Elliott*, 149 S.W.3d 77, 84–85 (Tenn. Ct. App. 2004)). Unilateral termination rights—even conditional ones—implicate these concerns as well.

Lurking beneath all of this, however, is a difficult question: What constitutes "bad faith"? Much of Hayden-Murphy's briefing effectively assumes that, if Wirtgen's decision to end the parties' relationship was ultimately motivated by its desire to align its dealership network with John Deere's, then any steps it took to end the relationship for a statutorily recognized "good cause" were inherently taken in bad faith. As the court has already discussed at length, however, nothing about either the parties' contract or the Tennessee equipment retailer statute[7] requires a supplier's formal "good cause" for termination or nonrenewal to be its only consideration in determining whether or not to exercise the underlying right. It is not bad faith simply to choose to avail oneself of a course of action "specifically allowed by the dealer agreement." *Town & Country Equip., Inc. v. Deere & Co., Inc.*, 133 F. Supp. 2d 665, 669 (W.D. Tenn. 2000)

The fact that the presence of additional motives does not necessarily establish bad faith does not preclude the possibility that bad faith might have, in any particular instance, existed. Nothing that Wirtgen did in this case, however, rises to that level. Wirtgen never concealed the fact that it had other reasons why it might wish to end the parties' relationship. Wirtgen's effort to, in effect, keep its alleged termination right based on Kirk's departure alive for several years was an aggressive move, but not a bad faith one; it was based on a colorable reading of the

---

[7] Under the contract alone, Wirtgen can terminate or decline to renew the parties' agreement for any reason, assuming that it follows the appropriate procedures. It is, therefore, debatable whether Hayden-Murphy should be able to pursue a claim based on the duty of good faith and fair dealing with regard to the requirements at issue, which are mostly imposed by statute. For the sake of this analysis, however, the court will assume, as Hayden-Murphy does, that the relevant, binding statutory provisions are implicitly incorporated into the contract. *See Kee v. Shelter Ins.*, 852 S.W.2d 226, 228 (Tenn. 1993) ("It is well established that the laws affecting enforcement of a contract, and existing at the time and place of its execution, enter into and form a part of the contract.") (collecting cases).

Distributor Sales and Service Agreement—particularly in light of the anti-waiver provision—and it is not bad faith for a party to advocate for the reasonable interpretation of an ambiguous contract that is most favorable to that party. Wirtgen's lack of consent to ownership changes was not bad faith, because Wirtgen was not even informed of those changes contemporaneously. Hayden-Murphy's limited briefing on this theory of recovery, moreover, provides no other plausible basis for prevailing. The court, therefore, will grant Wirtgen summary judgment as to Counterclaim 5.

## V. CONCLUSION

For the foregoing reasons, Hayden-Murphy's Motion for Summary Judgment (Doc. No. 76) will be denied, and Wirtgen's Motion for Summary Judgment (Doc. No. 78) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

30